No. 26,974.

M. F. Jamison, *Appellee,* v. The Atchison, Topeka & Santa Fe
Railway Company, *Appellant.*

### SYLLABUS BY THE COURT.

Railroads — *Accident at Crossing* — *Contributory Negligence* — *Last Clear Chance.* In an action for damages for personal injuries sustained by plaintiff in a railway-crossing accident, where the cause was tried on the theory that plaintiff's negligence would bar a recovery against the defendant railway company unless such recovery could be predicated on the doctrine of the last clear chance, the plaintiff's evidence examined, and held to show that his own negligence did not cease at any time prior to the collision of defendant's passenger train and plaintiff's automobile and consequently a judgment fixing exclusive responsibility for the accident upon the railway company on the doctrine of the last clear chance cannot be sustained.

Appeal from Woodson district court; Robert E. Cullison, judge. Opinion filed January 8, 1927. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott, Alfred G. Armstrong,* all of Topeka, and *F. M. Harris,* of Ottawa, for the appellant.

*James W. Finley, James A. Allen* and *B. M. Dunham,* all of Chanute, for the appellee.

The opinion of the court was delivered by

Dawson, J.: This action arose out of a railway-crossing accident in which defendant's passenger train collided with a Ford touring car which was stalled on the railway track, and in which collision plaintiff, its driver, received various severe injuries, one of which culminated in the amputation of his right leg.

The accident occurred about half a mile south of the town of Toronto, in Woodson county. South of Toronto station the railway track veers round a curve towards the southeast and then runs due south for a mile or two. A clear view of the crossing can be had by enginemen on a southbound train from a point about a quarter of a mile north of it. The public road over the railway runs east and west. The train which collided with plaintiff's car was a southbound passenger train running at thirty miles per hour. The collision happened about 10:30 o'clock in the forenoon. The day was

Negligence, 7 L. R. A. n. s. 132; 19 L. R. A. 446; 27 L. R. A. n. s. 379; 34 L. R. A. n. s. 687; 36 L. R. A. n. s. 957; 14 A. L. R. 1196; 20 R. C. L. 142. Railroads, 33 Cyc. p. 1094 n. 64.

misty, a recent heavy snow was melting, and the road and ground were very soft and muddy. Plaintiff had left Toronto to take some corn to his father's farm near the crossing and east of it. To get there, plaintiff drove across the track from the west, left the corn at the farm, and started back to town. The approach to the crossing was slippery, and when the front wheels of plaintiff's car had crossed the east rail, the car stalled; the rear wheels kept spinning in the mud; and on looking northward plaintiff saw the train about 400 feet away. He then made another effort to get the car across the track, but killed his engine, and the collision with its consequences happened.

Plaintiff's petition charged defendant with negligent failure to build and maintain the statutory sort of crossing—twenty-four feet wide, and level for thirty feet on each side of the center of the track, with approaching grades not exceeding six per cent, except where such specifications are excused by the county commissioners. (R. S. 66-227.) Other negligence charged against defendant was its failure to sound a whistle or give any warning of the approaching train, and—

"Failure to stop said train when his helpless and perilous situation was discovered by them [defendant's enginemen]."

Defendant's answer denied all the tortious acts alleged against it, and pleaded that plaintiff's injuries were caused wholly by his own negligence and not by any negligent act or omission of defendant or its employees.

The cause was tried before a jury. When the evidence was concluded, the trial court instructed the jury that plaintiff's contributory negligence was established by his own testimony, and that his right of recovery, if any, lay solely in the application of the doctrine of the last clear chance. The instruction touching plaintiff's negligence reads:

"4. Now in view of the testimony of the plaintiff himself that he knew all there was to know about this crossing, that he had a full view of the track for more than a quarter of a mile in the direction from which the train was coming and that after reaching the track and encountering difficulty in crossing because of things he knew beforehand existed he had ample time to see the approaching train and alight from the automobile or a chance to back same off the track and by either method avoid injury to himself if he had only looked, after getting upon the track, to see if a train was coming, and that he did not look until too late, you are instructed that plaintiff was, as a matter of law, guilty of negligence on his part in not looking and seeing said train and

Jamison v. Atchison, T. & S. F. Rly. Co.

that because thereof the complaint of plaintiff as to the character of the crossing and alleged failure of defendant to sound the whistle or give warning of the oncoming train cannot avail plaintiff as causes of action against defendant, and therefore the court will not instruct you further as to the law concerning the construction or maintenance of crossings, nor concerning the duty of defendant to sound the whistle or give other warnings of the approach of the train."

The jury returned a general verdict for plaintiff and answered two lists of special questions submitted by the parties.

### QUESTIONS SUBMITTED BY THE DEFENDANT.

"Q. 1. State the distance the train in question could have been seen approaching the crossing by a person looking for it from the roadway fifty feet east of the track.  A. ¼ mile. . . .

"Q. 3. Was the plaintiff thoroughly familiar with the crossing?  A. Yes.

. . .

"Q. 6. How many feet was the engine from the crossing when the fireman first discovered the plaintiff on the right of way?  A. 1,600 feet.

"Q. 7. How many feet was the engine from the crossing when the fireman first discovered that the plaintiff would come to a place of danger?  A. 1,600 feet.

"Q. 8. How many feet were required in which to stop this train on the track at the point in question going at a speed of 30 miles an hour?  A. 600 feet.

"Q. 9. If you find for the plaintiff, then state in what respect the defendant was negligent at the time and place in question.  A. They should of slowed down and had the train under control.

"Q. 10. After the fireman first discovered that the plaintiff was in or would come to a place of danger, what could he have done to avoid a collision?  A. By notifying the engineer to slow down.  . . .

"Q. 13. Did the automobile go upon the track, or did it strike the side of the pilot on the engine?  A. Front wheels over east rail.

### SPECIAL QUESTIONS REQUESTED BY PLAINTIFF.

"Q. 1. Did the plaintiff, M. F. Jamison, become stalled on the railroad track?  A. Yes.

"Q. 2. Was the train in sight when the plaintiff, M. F. Jamison, drove on the track?  A. No.

"Q. 3. Did the engineer and fireman see the stalled automobile, or could have seen it in the exercise of ordinary care, in time to have stopped the train and avoided injury to plaintiff?  A. Yes."

Defendant's motions for a new trial, to set aside certain findings, and for judgment *non abstante* were overruled, and judgment was entered for plaintiff.

The critical question in this appeal turns upon the propriety of submitting the cause to the jury on the doctrine of the last clear

chance. This doctrine can be invoked in negligence cases only where the party relying upon it has by his own prior negligence gotten himself into a predicament from which his subsequent diligence will not avail to extricate him without injury or damage through the act or delict of another party, but where such other party has a fair opportunity—a last clear chance—to avert or minimize the accident, injury or damage, by the exercise of reasonable diligence after the negligence of the first party has ceased. (*Dyerson v. Railroad Co.*, 74 Kan. 528, 87 Pac. 680, 7 L. R. A., n. s., 132 and note; *Juznik v. Railway Co.*, 109 Kan. 359, 364, 365, 199 Pac. 90; *Williams v. St. Louis-San Francisco Rly. Co.*, ante, p. 256, and citations.)

Just when did the plaintiff's negligence cease to be effective, so as to create a sufficient margin of time thereafter and prior to the accident in which the defendant had a fair opportunity, a last clear chance, to avert or minimize the collision and its consequences? The trial court instructed the jury that plaintiff was negligent. That instruction was the law of this case as far as it went, for neither party objected to it. Other instructions proceeded on the theory that after plaintiff's negligence ceased there still was or might have been an interval of time in which the last-clear-chance rule might be applied. But defendant contends that there was no appreciable interval of time prior to the collision when plaintiff's negligence was not a contributing cause of the collision and its consequences, and it cites and quotes from plaintiff's own testimony to show that plaintiff's negligence did not terminate at any time before the collision. As abstracted, that testimony reads:

"About ten o'clock on this morning he [plaintiff] and Ralph Weigand started out to this farm in a Ford touring car to take some corn. There was about two or three hundred pounds of this in the back end of the car. They drove along the road, . . . crossing the railroad track at the crossing in question, going east over the railroad track. . . . 'Well, I took this corn down for the hogs about 10 o'clock and I got to this crossing it was awful muddy and I wasn't making very much headway and I couldn't hardly get up the grade, but the corn in the back end kinda held it down enough that I finally got over, after coming to a standstill a time or two I finally got over the track.' . . . They stayed at the farm probably thirty to thirty-five minutes and then started back. This was about 10:30. When he got into the right of way and probably fifty feet from the track, he looked up and down the track and there was no train coming, so he went on up. It was awful slippery there, and on the north side of the grade it is higher than on the south side and they kept slipping off to the south, and were not making much time, and finally he looked around just before he went over on to the track and there was no train in sight, and they kept going on up until the hind wheels

Jamison v. Atchison, T. & S. F. Rly. Co.

got to the steepest place and the front wheels were on the track, and with what mud there was and the wheels spinning, made a pretty good-sized hump to get over, and he stalled his car. He looked around at the wheels and was probably in that position about half a minute, and then looked up the track and the train was coming from the north. This train was up there somewhere near 400 feet. He tried as hard as he could to get over the track and killed his engine, and didn't have time then to even get out of the car to keep from getting struck. The train was right on him and struck the car. . . .

"*Cross-examination.* . . . He couldn't tell how far up the track the train was when he saw it, but it looked like about 400 feet, and just an instant after he saw it, or just a few seconds, the collision happened. He had lived in the vicinity of this crossing all of his life and his father owns a farm just east of there. . . . He thoroughly understood the operation of the Ford car and of this particular engine which he was driving, and knew that one car thoroughly, and had driven it over this same crossing in the mud before this particular time. . . . He knew before he left Toronto just what the condition of the crossing would be. It was the same that it had been when he lived on the farm and when he started away from the farm to drive back to Toronto in the car, he knew exactly the kind of crossing he was to go over and all about it. . . .

"He knew that he could see about eighty rods up the track, and knows where the whistling post was up there. . . .

"Q. And you never got any view of it until it was right on you? A. No, sir; it took a great deal of time to get up that grade from the time I looked. . . .

"Q. And you went right on up without looking? A. Yes, sir.

"Q. And the first you saw was when the train was right on you? A. Yes, sir, pretty close.

"Q. Did you try to get out of the car? A. No, sir; I tried to get it over the track. . . .

"Q. Didn't try to do anything? A. Yes, I tried to get it over the track.

"Q. Was your engine killed? A. I killed it after I saw the train. . . ."

"*Recross-examination:* Witness was asked why he said 400 feet and answered that what he meant to say was that it was about that; it might have been more and it might have been less. He thinks probably eight or ten or twelve seconds elapsed from the time he saw the train and the collision. . . .

"Q. If you had looked when the train was at the whistling post you could have seen it clearly, isn't that correct? A. I could. . . . I say I didn't know when it was at the whistling post.

"Q. I understand, but if you had looked at that moment, you could have seen the train? A. Yes, sir.

"Q. Yes, sir, and from there clear down to the crossing, if you had looked? A. Yes, sir. . . .

"Q. . . . If you had seen the train at the whistling post, you could have climbed out of the car before it got to the crossing, couldn't you? A. Yes, sir; I suppose I could. . . .

"Q. And you could have backed your car down the hill to the east, too, couldn't you? A. I could if I had thought of it.

"Q. Yes, if you had looked and seen the train there at the whistling post, there was nothing to prevent your having backed your car towards the east, was there? A. No, sir. . . .

"Q. And all you were trying to do was to go ahead? A. Yes, sir.

"Q. But it was a down-hill pull backwards, wasn't it? A. Yes, sir.

"Q. There would have been no trouble in moving your car towards the east? A. Not so much; no. . . .

"Q. And you could have gotten clear out of danger if you had seen the train at the whistling post? A. Yes, sir."

In view of the foregoing testimony given by the plaintiff himself, this court is bound to hold that the plaintiff's negligence never did cease to operate prior to the collision in time to shift the exclusive blame for this collision upon the railway company. There was nothing to prevent plaintiff from backing his car off the track before the collision; he so testified; and he knew the car would not go forward under the muddy condition of the crossing. The special finding of the jury in answer to defendant's question No. 9, acquitted the defendant of the charge of negligence touching the maintenance of the crossing. (*Morlan v. Atchison, T. & S. F. Rly. Co.*, 118 Kan. 713, 715, 236 Pac. 821, and citations.) Even after plaintiff did discover the train 400 feet away, coming at 30 miles per hour, he still had nine seconds to step from his car and get out of danger. He could and would have come scathless out of his predicament if he had acted upon the most elementary principles of common prudence. At all events, plaintiff completely failed to make out a *prima facie* case showing that his own negligence had ceased for a sufficient length of time to have permitted the defendant by diligent action to have averted or minimized the accident and injury to plaintiff.

This conclusion renders it unnecessary to consider other errors assigned and argued by defendant.

The judgment of the district court is reversed and the cause remanded, with directions to enter judgment for defendant.