No. 34,249

HURON CLAGGETT, *Appellee*, v. PHILLIPS PETROLEUM COMPANY, and FRANK FISHER, *Appellants*.

(92 P. 2d 52)

Opinion filed July 8, 1939.

*Lee Judy* and *William H. McCamish,* both of Kansas City, for the appellants.

*Joseph Cohen,* of Kansas City, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action to recover damages for injuries sustained by plaintiff, a pedestrian, when struck by a truck of the defendant, the Phillips Petroleum Company, a corporation, driven by the defendant Frank Fisher, while plaintiff was crossing a street

in Kansas City, Kan., between intersections. Judgment was for plaintiff, and defendants appeal.

This action was here on a previous appeal by defendants, from an order sustaining plaintiff's motion for a new trial, and from the order overruling defendant's demurrer to plaintiff's evidence. (*Claggett v. Phillips Petroleum Co.*, 146 Kan. 846, 73 P. 2d 1015.)

In the instant case defendants assign as error: (1) The overruling of their demurrer to plaintiff's evidence. (2) The overruling of their motion for an instructed verdict. (3) Refusal of the trial court to set aside certain special findings of the jury. (4) The overruling of their motion for a new trial. The complaints concerning the ruling on the motion for a new trial relate to (*a*) instructions given; (*b*) the refusal to·give certain requested instructions; (*c*) excessiveness of verdict and (*d*) misconduct of the jury.

The assignments of error will be considered in the order stated. The facts pertaining to defendants' demurrer to plaintiff's evidence were sufficiently set forth in the former opinion to make their re-iteration here unnecessary. While the instant case was not tried on the former record, a review of the record in the instant case does not disclose sufficient variance in the evidence from that presented in the former record to justify or permit a change in our former ruling on defendants' demurrer. The ruling on that point will, therefore, be the same as in the former opinion.

The ruling, in the instant case, on defendants' motion for an instructed verdict, was proper, as a consideration of the special verdict will reveal.

The special verdict of the jury was as follows:

"1. At what speed per hour was the truck of defendant, Phillips Petroleum Company, being operated by defendant Fisher as it crossed New Jersey avenue, going north on Third street? A. Thirty-five miles per hour.

"2. At what speed per hour was the truck being operated by defendant Fisher when it was ten feet from plaintiff? A. Twenty-five miles per hour.

"3. Was the plaintiff under the influence of intoxicating liquor at the time of the accident? A. No.

"4. Had the plaintiff crossed the path of the truck to a point of safety immediately before the accident? A. No.

"4A. If you answer question four 'yes,' state how plaintiff got back into the path of said truck. A. ———

"5. Was the driver of the truck of defendant guilty of negligence in the operation of the truck at the time of the accident? A. Yes.

"6. If you answer the preceding question 'yes' then state what the negligence consisted of. A. Carelessness of driver and poor lights—inattention to opera-

tion of truck at intersection, consisting of excessive rate of speed and poor vision through windshield.

"7. Immediately before the accident occurred, and before plaintiff got in front of the truck, what, if anything, was there to prevent the plaintiff from seeing the truck driven by the defendant Fisher? A. Not anything.

"8. Do you find that the plaintiff, through his own carelessness, contributed to the injuries complained of? A. No.

"9. If you answer the preceding question in the affirmative, state what act or acts on his part contributed to said injury? A. ———

"10. At the time of the accident was the plaintiff walking diagonally across said Third street in a northeasterly direction? A. Yes.

"11. If you answer question No. 10 in the affirmative, then state from what point he started from the west side of Third street. A. About ten feet north of northwest corner of Third and New Jersey."

Defendants moved to set aside all answers except answers numbered 7, 9, 10 and 11, on the ground they were not supported by the evidence, were contrary thereto and were the result of passion and prejudice.

The objection to answer number one is that there was no evidence which fixed the speed at exactly thirty-five miles per hour. There was evidence in support of plaintiff's contention that the truck, at the intersection, was traveling between forty and fifty miles per hour, and evidence in support of defendants' contention it was traveling about fifteen or eighteen miles per hour, and that it was traveling between fifteen and twenty miles per hour. Defendants' evidence also disclosed the truck was equipped with a governor which prevented a speed of over thirty-five miles per hour. The jury decided the speed probably was not exactly that testified to by any of the witnesses, but was probably somewhere between the speeds testified to by the witnesses, and fixed the speed at thirty-five miles per hour. It was not required to believe the testimony of either of the parties or other witnesses as to the exact speed of the truck. A somewhat similar question arose in *Balandran v. Compton*, 134 Kan. 542, 7 P. 2d 510, under conflicting evidence, as to the exact distance of a car from the edge of the slab. The jury did not accept the exact testimony of any of the witnesses, and this court said:

"The jury evidently did not accept the testimony of either party as to the location of the appellee, but took rather the middle ground, which is probably not far from correct, that the appellee was on the edge of the pavement." (p. 546.)

Moreover, the precise number of miles per hour which the car was

traveling was not necessarily the turning point in this lawsuit as the driver of the truck was required to operate the vehicle at such a rate of speed as was reasonable and proper under the circumstances and so as not to endanger the life or limb of persons in the street.

It is likewise urged there is no specific evidence to support the precise speed very near the point of the accident as disclosed by finding number two. The testimony of the truck driver was to the effect that he reduced his speed between the intersection and a point about ten feet from the plaintiff by eight or ten miles per hour. Such reduction in speed would have resulted in a speed of approximately twenty-five miles per hour at a point ten feet from the point of the accident. In view of that situation we cannot say the court erred in refusing to set aside finding number two.

Touching findings numbers three and four, it is sufficient to say defendants frankly concede those findings were made in response to conflicting evidence. This court, of course, is concerned only with evidence and inferences which support or tend to support findings, and not with testimony adverse thereto. (*Meneley v. Montgomery,* 145 Kan. 109, 64 P. 2d 550.)

Answer number five is a finding the driver of the truck was guilty of negligence. Answer number six is not entirely free from difficulty. It purports to specify the negligence. When the jury first returned its verdict that answer was limited as follows: "Carelessness of driver and poor lights." That answer embraced two subjects, namely, the driver and the lights. By it the jury found the lights were poor. The words "carelessness of driver" were indefinite, and on the request of plaintiff the court directed the jury to make answer number six more definite. The jury then added to the former finding the additional portion of that answer. What was defendants' objection to that final answer? It was the same as was made to other answers. It was not that the answer pertained only to negligence at the intersection and that the answer should therefore be set aside as immaterial, but the objection was that the answer was not supported by evidence, was contrary thereto and was based on passion and prejudice. A careful review of the record discloses there was sufficient evidence if believed—and it was—to sustain all parts of the answer, with the possible exception of that part which pertained to the windshield. It may, however, have been in the mind of the jury, that the vision through the windshield was poor by reason of the poor lights. Considering the grounds of the motion to set the answer aside we cannot say the trial court erred.

Defendants now also insist that all negligence, specified in both portions of that answer, must be construed as having occurred solely at the intersection which was located about fifty feet south of the point of the accident. While that was not the basis of the motion on which the ruling was made, we have concluded to consider also that contention. Defendants' interpretation of that particular finding obviously would result in a failure to find the driver guilty of any negligence at the scene of the accident. Let us examine the answer in its entirety for the purpose of ascertaining whether the answer, when considered as a whole, is reasonably open to another interpretation. In other words did the jury, in view of the entire answer, intend to restrict the negligence solely to the exact point of the intersection, or is it more nearly in harmony with the general verdict to interpret that answer as intending to find that the negligence therein found caused the accident? If the jury intended to find there was no negligence at the scene of the accident, then of course, that particular finding would not be in harmony with the general verdict. Where findings of the jury are susceptible of two interpretations, the court will, if possible, adopt the one which will harmonize the findings with and sustain the general verdict. (*Lesher v. Carbon Coal Co.*, 127 Kan. 34, 272 Pac. 155; *Dyer v. Keith,* 136 Kan. 216, 219, 14 P. 2d 644.) The reason for construing special findings so as to harmonize them with the general verdict, if possible, is that nothing will be presumed in aid of special findings and that every reasonable presumption will be indulged in favor of the general verdict. (*Lesher v. Carbon Coal Co.,* supra; *Parmenter v. Morrison,* 130 Kan. 707, 710, 288 Pac. 582; *Jordan v. Austin Securities Co.,* 142 Kan. 631, 649, 51 P. 2d 38.) If we assume the portion of answer number six subsequently added was intended to refer only to the intersection can we reasonably and fairly say the finding of "poor lights" contained in the original portion of that answer was intended by the jury to be restricted solely to the condition of the lights at the intersection. We do not think so. "Insufficient lights" was definitely pleaded as a ground of negligence. There was evidence, although denied by the truck driver, that the driver told a witness at the scene of the accident "his lights were very dim, he could not see very well." There was also evidence to the effect that after the accident and while plaintiff was still lying in the street, at a point fifteen feet in front of the truck, the witness was required to get down very close to plaintiff in order to see him because the

truck lights were not very good. That witness, a deputy sheriff, testified "yes, the lights were very dim." Moreover, defendants cannot escape the result of the finding of negligence relative to "poor lights," even though we concluded the finding of "poor lights" referred to their condition at the intersection. Such a condition of the lights at the intersection clearly violated the city ordinance, which was pleaded, and which required lights of sufficient candle power to reveal objects 150 feet ahead.

Can we say the findings of excessive speed, inattention to operation of truck and poor vision through windshield, at the intersection, are meaningless findings when considered in conjunction with finding number one, which fixed that speed at thirty-five miles per hour at the intersection, and finding number two, which showed a reduction of only ten miles per hour at a point ten feet from the plaintiff? We do not think so. True, the accident did not occur in the intersection, but a review of the record indicates the jury probably desired to convey, by answer number six, the thought that the driver was traveling too fast at the intersection, and not paying sufficient attention to enable him to sufficiently reduce his speed before striking the plaintiff. Third street, on which the accident occurred, was fifty-three feet wide. The driver had testified to the fact he did not see the plaintiff until he was leaving the intersection and that the truck was then only fifty feet from the plaintiff. The deputy sheriff, a witness called by the plaintiff, testified concerning a conversation with the driver, which was as follows:

"A. Well, I asked him if he saw the man. He said yes he saw him. 'Why didn't you stop?' *He said he could not stop. He said something about his lights being dirty and that he could not see. He did not have a very good view* and when he told me, I went around and looked at his lights and his lights were *very dim.*" (Italics inserted.)

That testimony alone, in view of the fact there was no traffic or other obstruction to the driver's view, is sufficient to support the findings of inattention, excessive speed and poor vision for the entire distance, including the intersection.

Finding number eight absolved plaintiff of all negligence. It was clearly made from sharply conflicting testimony, and the jury resolved that conflict in favor of the plaintiff. That was its privilege and we cannot disturb it. This concludes the objection to specific findings.

A word in conclusion of the discussion of the special verdict may

be helpful. Finding number eight, when considered with findings numbers one, two, three and four, and only that part of finding number six pertaining to "poor lights," is clearly sufficient on the question of defendants' negligence to support the general verdict, even though the subsequent portion added by the jury to finding number six should be construed as pertaining only to negligence at the intersection.

In the early part of the opinion we referred to defendants' motion for an instructed verdict. In view of what has been said, that motion manifestly was properly overruled.

Did the court err in overruling defendants' motion for a new trial? It is urged no instruction was given on the subject of proximate cause and also that, in view of the magnitude of this case, the instructions should not have been confined to abstract statements of the law, but should have been so worded as to more clearly show their application to the particular facts of the case. We shall dispose of the last contention first. While some of the instructions might have been more easily applied to the particular facts, if that had been done, we cannot say the absence of such particularization constituted reversible error. There was nothing so unusual or complicated about the facts as to require particular mention or emphasis of certain facts in order to advise the jury of the rights and duties of the respective parties. Were the instructions fatally defective by reason of the absence of an instruction on proximate cause? The court quite fully instructed the jury on the subject of the precise negligence pleaded, the theory of the defense, the burdens of proof, as to negligence and contributory negligence and concerning the effect of each. In view of the instructions given we fail to see and are not definitely advised in just what manner the omission of an instruction on "proximate cause" prejudiced defendants' rights under the circumstances of this particular case. (See *Adams v. Casebolt*, 145 Kan. 3, 7, 8, 63 P. 2d 927.)

Defendants particularly complain concerning an instruction which they say was virtually an instruction on the doctrine of last clear chance and that neither the pleadings nor the evidence warranted such an instruction. They direct our attention to a statement of this court in its former opinion (p. 850), to the effect that the action was not founded on that doctrine. The statement in our former opinion does not appear to have been necessary to a review of the questions then presented and therefore probably should not have been made.

We were considering the ruling on defendants' demurrer to plaintiff's evidence. Last clear chance, if properly pleaded, was only one of the grounds upon which plaintiff could have relied for recovery. If plaintiff's evidence was sufficient to take the case to the jury upon any theory, defendants' demurrer to plaintiff's evidence was properly overruled. We held in the former case the demurrer was properly overruled. We did not intend by the statement to convey the idea the doctrine could not, under any evidentiary circumstances, become applicable. If the statement was confusing to defendants, have they been prejudiced thereby? The statement does not appear to have confused plaintiff or the trial court in the instant trial. Plaintiff, on retrial, stated he had pleaded last clear chance and the trial court, as now stated by defendants, attempted to instruct upon that subject. The real question now, so far as defendants are concerned, is therefore this: Assuming the pleadings and the evidence in the instant case did not warrant the instruction, have defendants been prejudiced thereby in view of the special finding of the jury that plaintiff was not guilty of any negligence? The doctrine of last clear chance, insofar as a plaintiff's conduct is concerned, is predicated upon the theory the plaintiff was negligent, that his negligence placed him in a predicament from which he could not extricate himself, and that his negligence thereafter had completely ceased. (*Jamison v. Atchison, T. & S. F. Rly. Co.,* 122 Kan. 305, 308, 252 Pac. 472; *Buchhein v. Atchison, T. & S. F. Rly. Co.,* 147 Kan. 192, 196, 75 P. 2d 280, and cases therein cited.) These were questions for the determination of the jury, if properly in the case under the pleadings and the evidence. We have previously, however, and on various occasions held that where the jury completely absolved a plaintiff of all negligence, that the doctrine of last clear chance thereafter becomes immaterial on review and concludes that phase of the lawsuit. (*Turner v. George Rushton Baking Co.,* 135 Kan. 484, 489, 11 P. 2d 746; *Bergman v. Kansas City Public Ser. Co.,* 144 Kan. 27, 58 P. 2d 110.) In the latter case it was said:

"It is further contended the doctrine of last clear chance was not in this case. Defendant asserts last clear chance was not pleaded; plaintiff could have stopped within one or two feet and hence he at all times had the last clear chance to avoid the accident; plaintiff's negligence was a continuous process and never ceased, and instruction No. 16 was an incorrect statement of the doctrine. Had the jury found plaintiff guilty of contributory negligence, some of these contentions would be entitled to serious consideration. The jury, however, found to the contrary. In *May v. Kansas Power & Light Co.,* 134 Kan. 470, 7 P. 2d 108, it was said:

" 'Counsel for defendant contend that the sole question in this case involves the doctrine of "last clear chance." If so, there is no use for further discussion. That doctrine could only apply here if the plaintiff himself had been negligent, that his negligence had ceased, and that defendant thereafter had an opportunity, if diligently exercised, to save plaintiff from the peril his own negligence had gotten him into. (*Jamison v. Atchison, T. & S. F. Rly. Co.*, 122 Kan. 305, 252 Pac. 472; *Dearing v. Wichita Rld. & Light Co.*, 130 Kan. 142, 285 Pac. 621.) Here, however, there was no negligence on the part of plaintiff, and the jury's special findings conclude that phase of this lawsuit.' (p. 474.)" (p. 32.)

Defendants have not indicated in what respect those principles do not govern the point now raised, and we know of no reason why they should not be applied in the instant case.

It is earnestly urged certain requested instructions should have been given and that the substance thereof was not included within the instructions given. Upon a careful review of the instructions we have concluded that, as a whole, they were sufficient to prevent this court from declaring a mistrial upon the grounds urged.

Complaint is made the verdict was the result of passion and prejudice. The district court, in ruling on post-trial motions, appears to have carefully considered this complaint, as well as others, and it specifically found against the contention. It approved the verdict and in so doing took occasion to remark about the fact that the jury was far above the average. There is nothing in the record which would justify this court in overthrowing the conclusion of the trial court, deliberately reached, that the verdict was not the result of passion and prejudice.

Complaint is also made that the verdict in the sum of $15,666 is excessive. Plaintiff was a common laborer, a strong, able-bodied man and thirty-seven years of age at the time of the accident. He was earning from fifty-five to sixty cents an hour on an eight-hour day as an employee of the Tobin Construction Company. He tamped cement, laid concrete and dug ditches. He had also worked for packing companies. Following the accident he was in the hospital for a period of four and one-half months and was unconscious from Saturday evening until the following Monday morning.

Dr. C. C. Nesselrode, a physician and surgeon, and an instructor at the University of Kansas, was called as a witness by plaintiff, and testified in substance:

He was called on December 7, 1935, and found plaintiff partially unconscious and irrational, with a cut on his forehead and chin and a comminuted fracture of the right leg above the knee. It was

harder to set than the ordinary fracture because it slipped out of place several times. He had a fractured skull which destroyed the vision of his left eye. The injury to the base of the skull might affect the hearing in his ear, the same as it affected the optic nerve, but he made no test for hearing. Plaintiff's leg was shortened about one and one-half to one and three-quarters of an inch. The shortening of the leg caused him to limp and the limping caused him to twist his back when he walked and had a tendency to weaken his back. He suffered a concussion of the brain which caused an injury to the brain. Plaintiff could do some light work, but would not be accepted for employment in any industry. He did not remember that plaintiff had complained of any inability to sleep while in the hospital, but that the nurses complained about the fact that they were unable to keep him in any position in bed. (Plaintiff had testified he had been treated for syphilis by the board of health in Detroit, Mich., in 1925.) A luetic lesion and syphilis are one and the same thing, and if plaintiff had a luetic lesion it might affect him as far as his nervousness and dizzy spells were concerned. His opinion concerning plaintiff's ability to work would not be changed even if it was a fact that plaintiff had worked four or five months on the WPA after his injury.

Dr. C. J. Mullins, a graduate of Creighton University, a member of the clinical staff in the eye department of the University of Kansas, testified in substance:

He began treating plaintiff's eye about December 10, 1935, and saw him at intervals over a period of two months and his eye did not improve, but lost a little more vision. The vision in his left eye was now completely destroyed, due to the injury of the optic nerve, which might have resulted from the fracture of the skull. There would be no regeneration or restoration of eyesight and that it would not affect his right eye. There was no question about the fact that the loss of the sight of the left eye was due to the accident and was not in the least referrable to the luetic lesion.

Plaintiff had also testified, in addition to some of the facts related by the doctors, in substance as follows:

When he walked he was required to bend over, which threw his spine out of line. He had done no hard manual labor since the accident. He could not lift anything as he could not stand up on his leg. He could not even put his pants on his right leg unless he held to something to steady himself. His back hurt when he walked.

He weighed 168 pounds when injured and 134 pounds when he left the hospital. He was in bed at the hospital all of the time except for a few weeks. He was unable to sleep because of his nerves. The headaches and dizzy feelings existed nearly all of the time. Since the accident he had driven a taxicab for about two months, during which time he earned about $8 or $10 a week. He quit work because he could not stand it. He tried to get light work, but the industries would not hire him. His back hurt when he walked. He lost the hearing in his left ear.

It was agreed plaintiff's hospital bill amounted to $470.50. Doctor Nesselrode was of the opinion a fair and reasonable charge for the doctors' services would be from $150 to $200.

There was testimony offered by defendants' witnesses that plaintiff had worked for the WPA under the assumed name of his brother.

The trial court carefully reviewed the evidence as to injuries and concluded that in view of the testimony of the doctors as to the numerous injuries suffered and the seriousness thereof it could not say the verdict was excessive. In view of all the circumstances, the amount of the verdict does not shock the conscience of this court and we shall not disturb it.

It is finally urged the verdict was a quotient verdict and for that reason cannot stand. Jurors were called to testify as to the manner in which they arrived at their verdict. The substance of the testimony was that they all believed plaintiff should recover, but that they were not originally in agreement as to the exact amount. They did believe he should be compensated in the amount of about $50 per month and that he probably would have been able to work until he was approximately sixty or sixty-five years of age. The amount the various jurors thought he should receive was set down and they divided that amount by twelve. After doing so they discussed that amount for some period of time and concluded to call for a yes-or-no vote on that amount in the sum of $15,666. The vote resulted in a unanimous decision to return a verdict in that amount. The jurors had not, however, prior to setting down the respective amounts and prior to the division of the total amount, agreed that the quotient should constitute their verdict. It does appear that method was employed as a means of arriving at an amount which formed the basis for further consideration. This court has frequently stated that a verdict reached, under very similar circumstances, did not constitute a quotient verdict. (*Newell v. City Ice Co.*, 140 Kan.

110, 34 P. 2d 558, and numerous cases therein cited.) The trial court in the instant case, after hearing the testimony of the jurors as to the manner in which they finally reached the verdict, concluded this was not a quotient verdict. In considering the question the trial court said:

"In reference to the quotient verdict, I would say that the testimony of the jurors who testified this morning is convincing. At least they tried to arrive at a verdict, as in all cases of course there is a compromise on one side or the other. The jurors seemed to have an understanding that they could not return a quotient verdict. I think that the testimony of those jurors absolutely proves it was not a quotient verdict."

In the case of *Fitch v. State Highway Comm.*, 137 Kan. 584, 21 P. 2d 318, this court said:

"Whether the verdict was or was not a quotient verdict was a question of fact for the trial court to determine, and the verdict having been approved by the trial court, this court will not disturb the judgment on that account." (p. 587.)

In the instant case the testimony was clearly sufficient to support the finding of the trial court that the verdict was not a quotient verdict, and the finding will stand.

We have reviewed the authorities cited by the respective parties, on the various contentions, and are persuaded they are not out of harmony with the views herein expressed. The judgment is affirmed.