No. 38,402

MARVIN WILL, *Appellee,* v. JAMES HUGHES and MARGARET HUGHES, *Appellants.*

(238 P. 2d 478)

Opinion filed
December 8, 1951.

*John E. Wheeler,* of Marion, argued the cause, and *Bruce C. Heath,* of Abilene, was with him on the briefs for the appellants.

*John M. Rugh* and *John F. Christner,* both of Abilene, were on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: Defendants, a brother and sister, appeal from a judgment rendered against each of them for actual and punitive damages in an action instituted by a tenant of farm land.

The amended petition of Marvin Will, in substance, alleged: He was a tenant under an oral lease from August, 1947, to August, 1949, of a forty-acre tract of land in Morris county which was rented by the owner, Margaret Hughes; on or about July 5, 1949, James Hughes, a duly authorized agent of the defendant, Margaret Hughes, wrongfully entered, broke in upon and interrupted the quietude of his possession and directed the harvesting of wheat being grown on the land; James Hughes maliciously and oppressively refused to allow him to enter the premises; he motored to Council Grove and returned with the sheriff but was unsuccessful in his attempt to gain peaceful access to the property for himself, his crew and equipment; he was damaged in the sum of $129.36, the fair value of his portion of the crop severed and carried away, in the sum of $100 for loss of one day's use of plaintiff's combine and was entitled to $2,500 exemplary damages and the costs of the action.

Defendants' verified answer admitted the plaintiff's tenancy. It specifically denied James was the duly authorized agent of Margaret and that Margaret did not herself or through any agent wrongfully enter upon the premises or interrupt plaintiff's quiet possession in an attempt to harvest his crop. The answer further alleged no agency existed between Margaret and James and that James was charged with the sole custody and control of the property.

Plaintiff's reply denied that there was no agency between Margaret and James and that James was charged with the sole custody and control of the property.

Upon the issues thus joined the action was tried and the jury returned a general verdict against each of the defendants as follows:

"For Actual Damages                    $179.36
"For Punitive Damages                  $500.00
                                       ─────────
          "Total,                      $679.36"

The defendants appealed. Their common and their separate contentions of error will be stated later under separate headings.

The defendant James had not demurred to plaintiff's evidence but a demurrer was interposed on Margaret's behalf. The grounds thereof, in substance, were the evidence failed to show she was plaintiff's landlord and that although it disclosed she was the owner of the property it failed to show she exercised control over the property.

We thus start with defendants' admission Margaret was the owner of the leased land. A few other factors may be disposed of without a lengthy narrative of plaintiff's testimony. Defendants' contention that plaintiff's evidence showed Margaret exercised no control over the land is too broad. The evidence disclosed no disputes of any kind or character over the tenancy covering the years 1948 and 1949 ever arose except the dispute here involved concerning the alleged unlawful cutting of ten acres of wheat on Margaret's land by James in 1949. All other divisions of grain over the entire two year period were made entirely between the plaintiff and Margaret by the delivery of Margaret's share of the grain to the elevator she indicated, the delivery of plaintiff's share to the elevator of his choice and amicable settlements between them. Whether Margaret was involved in the alleged unlawful conduct of James in 1949 will be considered later.

It was defendants' theory that James had rented the land from Margaret and that James was plaintiff's landlord. Defendants' testimony supported that theory but on this demurrer the trial court was concerned only with plaintiff's testimony.

The well established rule is that on demurrer courts consider only testimony favorable to the party adducing it and accept it as true without regard to conflict in the testimony on direct and cross-examination. (*Burgin v. Newman,* 160 Kan. 592, 593, 164 P. 2d 119.)

We need not unduly labor the question whether Margaret was plaintiff's landlord. The testimony was ample that she was. It is true that in 1947 the plaintiff first contacted James and inquired of him whether he had some land to rent and was advised he did not but that his sister Margaret might have. James later contacted the plaintiff and, in effect, advised him that he could rent the forty acres in question. James did not tell plaintiff he already had a lease from Margaret on the land. Plaintiff farmed it in 1948 and all crop settlements for that year were made with Margaret. After the 1948 harvest plaintiff inquired of Margaret whether he might have the land for the year 1949 and she informed him that she knew of no reason why he should not have it. These facts are all admitted by Margaret's demurrer. We are, therefore, forced to conclude Margaret's demurrer on the ground plaintiff's evidence did not disclose she was plaintiff's landlord was untenable and was properly overruled.

We now shall consider plaintiff's evidence touching the facts and circumstances surrounding the alleged unlawful interference with his harvesting of the 1949 crop. That testimony, in substance, was:

He had also rented ten additional acres of ground from James for the year 1949; in addition thereto he rented eighty acres just across the road and a quarter of a mile north from a man by the name of Parkins; he had rented the Parkins' land in 1948; neither Margaret nor James made any complaint about the manner in which he had farmed the forty acres in 1948; the 1949 wheat crop on Margaret's forty acres started to mature about the first part of July; on June 30 he started cutting the ten acres he had rented from James; one-third of that wheat belonged to James and two-thirds to him; from Margaret's land Margaret received two-fifths and he received three-fifths of the crop; he started cutting wheat about the same time other farmers in the neighborhood were cutting theirs, although some of them cut even later than he did; after cutting the wheat on the James' land he started cutting on Margaret's; there were several draws running through Margaret's land and there were a lot of weeds in the low places on her land as well as in low places on other lands; that was true about the Parkins' land; he, therefore, cut the wheat in the draws first in order to try to save as much of it as possible; he finished cutting the low weedy portion of Margaret's land on July 1 and 2; the wheat on Margaret's land which he did not cut at that time was not in immediate danger

of being lost by reason of the weeds; he then moved his equipment onto the Parkins' land and cut wheat in the low places there during the latter part of July 2 and on July 3, 4, and 5; at about 3:30 p. m. on July 5 and after he had cut most of the weedy portion on the Parkins' land James came to see him and inquired whether he was going to finish the entire Parkins' field at that time; he advised James he was not but that he did want to make about six or seven additional rounds in the low weedy portion of the draw and that he would then return to Margaret's land in thirty or forty-five minutes after they had eaten their lunch; he asked James why he was inquiring and James said, "Well, I have just decided if you want that wheat you are going to follow me right over there or you will not have any wheat when you get over there"; he told James that was his wheat, to stay out of there and that he would see their share of the wheat got into the elevator the same as his own; his brother, Walter, took a load of wheat from the Parkins' land to town and talked to Margaret; Walter returned to the Parkins' land; they moved over to Margaret's land and found two twelve foot combines cutting the wheat; he asked James to quit cutting and James replied that he (plaintiff) did not want his wheat and he (James) was cutting it for him and that he (plaintiff) had nothing to say about it.

Plaintiff's own evidence, in substance, further disclosed:

He went to Mr. Kandt, who was cutting the wheat, and asked him to stop operations for the reason that he desired to cut his own wheat; Kandt replied he did not know it belonged to him, but understood it belonged to James, who had hired and paid him to cut ten acres and that they were forced to cut that much; he then went to the home of his folks about a mile away and called the sheriff; he asked James and Kandt to leave everything just as it was until he and the sheriff returned; when he returned alone the cutting had been finished; the truck driver inquired what he wanted done with the wheat; he advised him to leave it until the sheriff arrived and that they would then divide it correctly; the wheat was nevertheless hauled off the place before the sheriff arrived; he had previously cut about half the wheat on this forty acres; it averaged ten to ten and a half bushels per acre and that included the weedy portions of the field; on the next day he finished cutting the remainder of the wheat; James and his crew took approximately 105 bushels of wheat off the place; James and his men had started

cutting it about 4:00 p. m. and finished the ten acres in about an hour or an hour and a half; he never received any portion of his share of the wheat which they removed; the wheat was worth about $1.99 per bushel; neither Margaret nor anyone else ever previously informed him that James had any authority to cut the wheat; the morning of the trial was the first time he had ever heard that James claimed any right to the wheat; he had always deposited Margaret's share of the wheat to her credit at the elevator and never to the credit of James; he had never lost any land because of inattention or lack of saving a crop; he cut a portion of Margaret's crop and all of Parkin's crop in order to save the wheat in each of the fields; he helped his own brother finish cutting his wheat on a neighboring place even later than he had cut on Margaret's and Parkins' places; other neighbors were cutting five or six days later than he did; prior to harvesting the 1949 wheat he asked Margaret where she wanted her share delivered and she advised she had made arrangements with the White Grain Company for her wheat; he wanted his own delivered to the Continental; Margaret directed him to divide the wheat in the best way possible and to bring her the tickets when he was through harvesting and they would then settle; he delivered Margaret's share of the wheat which he cut as she directed and received grain tickets therefor; his combine was an eight-foot combine and it would, therefore, take longer for him to harvest the wheat than the larger combines James used; he went to Margaret to get a settlement a few days after harvesting but never was able to get a settlement from her; she did not direct him to see James about the settlement; he leased the combine he used from his father; by reason of the conduct of James he was unable to get into the field and lost the use of two men, a tractor and a combine for the time it would have taken to cut the ten acres which James cut; he did not remember exactly how his attorney had estimated that damage when he drew the petition; James paid $38.64 for having the wheat combined; they did it in about an hour and a half; that would have averaged about $25 an hour; he lost about four hours time for himself, his men and equipment.

The testimony of Walter Will, plaintiff's brother, corroborated that of the plaintiff relative to the statement James made to the plaintiff on the Parkins' place and plaintiff's answer to James. The brother further, in substance, testified:

When he took the load of wheat to town from Parkins' place, just

after James had been there, he went to see Margaret; at plaintiff's request he asked Margaret whether James had a right to go onto her place and cut the wheat; Margaret did not want to discuss the matter; she said she did not know what to do; when he told her that plaintiff had called the sheriff she said she didn't like for them to get into any trouble and that she didn't want any trouble; Margaret didn't say whether James represented her as the landlord; she didn't indicate whether she knew James was in the field before he (Walter) told her; she only said she would like to have her wheat saved; he told her that he and the plaintiff would be ready to go over to her place and start cutting in thirty or forty-five minutes; she didn't reply to that statement but turned around and went back to her work; he and his brother were ready to leave the Parkins' place within fifteen or thirty minutes after James left there; in going to the different fields they were trying to get all of the weediest wheat first; they finished cutting the weedy portions of their wheat in the different fields sooner than many of the neighbors.

The material portion of Parkins' testimony was that he had rented land to the plaintiff, that plaintiff was a better than average farmer and his work had been satisfactory.

Ted Meyer, who had cut the wheat at James' direction, testified there was no shattering of the wheat at the time but that it might have shattered some in the event of rain.

Dick White, operator of the White Grain Company testified, in substance:

On July 5 he received seventy-two bushels of wheat which was ordered stored by the driver to the sole credit of Margaret and that he later made settlement with her for it; he did not remember the driver and did not know from what land the wheat came; the driver told him to credit it to Margaret; there seemed to be some doubt about it so he called Margaret and she said she knew absolutely nothing about the trouble or anything about it.

What about the subject of damages? If plaintiff's evidence disclosed he was damaged in any sum by Margaret's conduct her demurrer was properly overruled. Her demurrer admits she has never accounted to the plaintiff for his share of the wheat taken from the land by James. That, without damage due to the loss of use of the combine, is sufficient to withstand the demurrer. It will be ob served the demurrer made no distinction between actual and punitive damages but was general in character. It follows it was properly overruled.

This brings us to the question whether the verdict of the jury can be disturbed with respect to actual or exemplary damages. We shall first consider the verdict for actual damages against both defendants. The evidence relative to the amount of wheat removed was highly conflicting. It was the jury's province to resolve the conflict. Defendants argue only seventy-two bushels thereof were credited to Margaret's account at the elevator. We are not concerned here with how much wheat James had credited to Margaret's account *at the elevator* but with how much wheat he removed from the land. Plaintiff's evidence discloses Margaret did not account for any portion of the wheat which James removed. The jury had a right to find ten acres of wheat were combined; that it averaged ten or ten and one-half bushels per acre; that it was worth $1.99 per bushel. Three fifths of 100 bushels at the above price amounts to $119.40. That amount subtracted from the verdict of actual damages in the sum of $179.36 leaves $59.96 for acual damages claimed for plaintiff's loss of the use of the combine and his men. If plaintiff is credited on the basis of ten and one-half bushels per acre he would be entitled to another credit of three bushels or about $5.97. This would reduce the damages allowed for loss of use of the combine to that extent or to about $53.99.

Although the evidence touching damages for the last item was not too clear, as indicated by a previous review of plaintiff's evidence, and although it is not entirely clear how the jury arrived at the exact figure of $179.36 for total actual damages we would have difficulty disturbing that part of the verdict. This was not a case in which the jury was compelled to return a verdict for no damages or a verdict for the exact amount alleged in plaintiff's petition. The verdict was within the range of plaintiff's evidence. Under such circumstances it ordinarily will not be disturbed. (*Young v. Irwin*, 70 Kan. 796, 79 Pac. 678; *Sheftel v. Kansas City Public Service Co.*, 137 Kan. 79, 81, 19 P. 2d 434; *Claggett v. Phillips Petroleum Co.*, 150 Kan. 191, 193, 92 P. 2d 52; *Stafford v. Fidelity Hail Ins. Co.*, 162 Kan. 75, 76, 173 P. 2d 1022.) It, therefore, appears the verdict for actual damages should stand.

Defendants contended below and argue now James and not Margaret was plaintiff's landlord and that G. S. 1949, 67-525 was applicable to the issues as joined. The court accordingly instructed the jury that statute, insofar as applicable, provides:

"When any . . . rent is payable in a share or certain proportion of the crop, the lessor shall be deemed the owner of such share or proportion,

and may, if the tenant refuse to deliver him such share or proportion, enter upon the land and take possession of the same. . . ."

It is true a landlord has an interest in a crop before it matures when rent is payable in shares. Absent an agreement to the contrary that interest ordinarily becomes complete at the maturity of the crop. (*Wiehl v. Winslow*, 118 Kan. 147, 149, 233 Pac. 802.) Although there is not complete harmony on the subject the usual view is that under such a lease the landlord has no actual title to any part of the crop until its division. (*Wyandt v. Merrill*, 107 Kan. 661, 663, 193 Pac. 366.)

Let us, however, assume for the moment, without deciding, that defendants were entitled to the instruction given and that either of them, if found to be the landlord, had a right to protect the landlord's share of the crop by *harvesting* it in the event the tenant negligently failed to do so. How can that assumption aid either of these defendants on appeal?

Whether the tenant was negligent in protecting the crop, irrespective of which one of the defendants was the landlord, was a question for the jury which it resolved in the tenant's favor. A general verdict is one by which a jury pronounces generally on all issues of fact submitted to it for determination and on review this court must assume the jury resolved all controverted issues of fact in favor of the prevailing party. (*Phillips v. Hartford Accident & I. Co.*, 157 Kan. 581, 142 P. 2d 704.) We must, therefore, assume the jury concluded neither Margaret nor James had a right to interfere with the tenant's harvesting of the grain.

But was Margaret responsible for such interference? There was no evidence she authorized the acts of James before they were committed. She did, however, retain the benefits of the wrongful act. According to plaintiff's evidence she never accounted to him for any of the wheat James removed.

In 2 C. J. S., Agency, § 34a, the rule is stated thus:

"Ratification in agency is an adoption or confirmation by one person of an act performed on his behalf by another without authority. The substance of the doctrine is confirmation after conduct, amounting to a substitute for prior authority."

To the same effect is the statement in 2 Am. Jur., Agency, § 232, and in other authorities.

In *Flitch v. Boyle*, 149 Kan. 834, 89 P. 2d 909, it was held:

"When a principal, expressly or implied, elects to ratify an unauthorized act, he must, so far as it is entire, ratify the whole of it and he will not be permitted to accept its benefits and reject its burdens." (Syl. ¶ 1.)

See, also, *Watson v. Woodruff*, 154 Kan. 61, 114 P. 2d 864. The ratification by the principal of an unauthorized act of his agent is equivalent to an original grant of authority. (*Aultman v. Knoll*, 71 Kan. 109, 79 Pac. 1074.) Upon acquiring knowledge of the agent's unauthorized act the principal should promptly repudiate the act. Otherwise, it will be presumed he has ratified and affirmed the act. (*Isaacs v. Motor Co.*, 108 Kan. 17, 193 Pac. 1081.) In all cases he must repudiate the unauthorized act at least within a reasonable time. (*Hartwell v. Manufacturing Co.*, 78 Kan. 259, 97 Pac. 432.)

The only remaining questions are whether the jury was justified in awarding a verdict for exemplary damages against the defendants and, if so, whether that verdict was excessive.

Defendants contend there was no basis for any verdict for exemplary damages against either of them. They lean heavily upon statements contained in the opinion in *Motor Equipment Co., v. McLaughlin*, 156 Kan. 258, 133 P. 2d 149, and in a portion of the syllabus which reads:

"Punitive damages are imposed by way of punishing a defendant for malicious or vindictive acts or for a willful and wanton invasion of plaintiff's rights, the purpose being to restrain him and deter others from the commission of like wrongs." (Syl. ¶ 10.)

The correctness of the rule is not disputed by the plaintiff. The problem here is the proper application of the rule to the instant facts. It was, of course, the duty of the jury to determine the credibility of the testimony of the various witnesses and to weigh it. The jury had the responsibility of determining whether there was a reasonable excuse or justification for interference with the harvesting as conducted by plaintiff or whether the acts of James and his demeanor were vindictive or malicious. Surely the jury, and the trial court in approving the verdict, had a much better opportunity to determine those factors than this court has in examining a cold printed record. Of course, if on appellate review this court were permitted to adopt defendants' version of the over-all transaction we might agree with them but we are not at liberty to substitute our judgment for that of the jury. We cannot say, as a matter of law, that the acts of James were not vindictive or malicious.

Can the verdict for exemplary damages against Margaret be sustained? We previously indicated she accepted the benefits of the wrongful and vindictive conduct of James as her agent and that

having done so she cannot escape the burdens or responsibilities thereof for actual damages. Margaret, according to plaintiff's evidence, did not repudiate the conduct of James at any time after she learned of it but on the contrary retained the benefits thereof. Having done so she ratified his acts. A ratification on the part of the principal or master of the act of his agent or servant may consist in receiving and retaining the benefits thereof. (25 C. J. S., Damages, § 125 (2), p. 736; 15 Am. Jur., Damages, § 289; *Farvour v. Geltis,* 91 C. A. 2d 603, 205 P. 2d 424; *Kilpatrick v. Haley,* 66 F. 133.)

The court instructed the jury on the subject of ratification without objection by defendants. The instruction on the subject became a part of the law of the case and defendants cannot complain that the court instructed on that subject.

Was the verdict for exemplary damages excessive? It is difficult to lay down a precise rule by which to test the question of an excessive verdict for punitive or exemplary damages. (*Motor Equipment Co. v. McLaughlin,* supra, p. 273.) If the verdict appears to be grossly excessive it may be reduced in the same manner as excessive verdicts for actual damages. (*Motor Equipment Co. v. McLaughlin,* supra, p. 273.)

The law establishes no fixed ratio by which the excessiveness of exemplary damages to the actual damages allowed is to be measured although the actual damage is sometimes considered. In assessing exemplary damages the nature, extent and enormity of the wrong, the intent of the party committing it, and, generally all the circumstances attending the particular transaction involved, including any mitigating circumstances which may operate to reduce without wholly defeating such damages, may be considered. (15 Am. Jur., Damages, § 298.) Under all the attending circumstances in this case we think the verdict for exemplary damages should be reduced by $250. Plaintiff is, therefore, given the option of accepting that amount within ten days from the date of this decision. If plaintiff exercises that option as directed the judgment so reduced is affirmed. Failing to exercise the option a new trial on the issues generally is directed.

Defendants also complain concerning certain instructions. It appears they were given full opportunity to examine them and to object thereto prior to the submission of the case to the jury but failed to do so. It is possible certain instructions might have been

somewhat fuller but we discern no reversible error in them. No request was made for modification, clarification or amplification thereof. Under these circumstances it was not error to refuse a new trial on that ground. (*Kerby v. Hiesterman,* 162 Kan. 490, 178 P. 2d 194.)

The judgment is affirmed in accordance with and upon the conditions herein stated.