No. 29,886.

JOHN J. GRIFFIN, *Appellee*, v. THE OKLAHOMA NATURAL GAS CORPORATION, *Appellant*.

(297 Pac. 662.)

Opinion filed April 11, 1931.

*Frederick G. Apt, A. R. Enfield,* both of Iola, *R. C. Allen, I. J. Underwood, Sam S. Canterbury* and *Paul Pinson,* all of Tulsa, Okla., for the appellant.

*F. J. Oyler* and *G. R. Gard,* both of Iola, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by an employee for breach by the employer of the contract of employment, the breach consisting in failure to give ninety days' notice before discharge. Plaintiff recovered, and defendant appeals.

Plaintiff was employed by the Southern Kansas Gas Company, at a salary of $300 per month, and had a contract that he would be given ninety days' notice of termination of employment. Defendant purchased the assets of the Southern Kansas company, and took possession on March 1, 1928. Plaintiff prints in his brief the granting clause of the contract of purchase as follows:

"All rights, privileges, franchises, _contracts, agreements_ . . . *of every nature, whatsoever.*"

The clause reads as follows:

"All rights, privileges, franchises, contracts, agreements, permits, licenses and easements of every nature whatsoever, for or relating to the supply of gas and/or oil, now owned by the company."

Therefore defendant purchased contracts of the Southern Kansas company relating to supply of gas and oil, and not contracts with employees. However, plaintiff continued to work for defendant, and he gave testimony, which was disputed, that defendant confirmed the agreement with the Southern Kansas company for ninety days' notice of discharge.

After defendant took charge, plaintiff's immediate superior was Ulrich. Ulrich notified plaintiff of a reduction of plaintiff's salary to $250 per month, and on May 7 plaintiff wrote a letter to Long, who was defendant's vice president and superintendent, complaining of the conduct of Ulrich, and stating the writer was under the impression Ulrich wanted to get rid of him. Portions of the letter follow:

"It is my present intention to resign as of June 1, as things are now impossible, and my only reason in writing you is to ascertain if you as a director of this company approve of the methods used by this egotistical, domineering Kaiser.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"However, if it is the policy of this organization to approve the tactics of Mr. Ulrich, you have my resignation to take effect June 1."

Plaintiff's office was in Iola, and Long replied he would be in Iola the next week. Long went to Iola, and had a personal interview with plaintiff at the company's warehouse. The testimony is conflicting with respect to what occurred. Long testified as follows:

"I told Mr. Griffin that I was very much surprised to receive his letter, and at the position he took in it; that it was the policy of our company, over many years of experience, to be very fair with the employees, and that if they could not do the work where they were placed, or if they were not happy or contented, or if they didn't coöperate to the fullest extent with other employees and fellow workers, to try and find something else for him, and that was my purpose in coming up here. He had made some allegations there against our superintendent, in whom we had the greatest confidence, and I wanted Mr. Ulrich there during this conversation. Mr. Griffin, apparently, didn't receive my overtures very kindly, because he popped off and got a little sore, and he says, 'Well, I have quit, and that's all there is to it.' He says, 'I have got other work.' He says, 'I have got something else in view right now.'

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"After my statement to Mr. Griffin at our warehouse, he made this statement to me. He told me about his experience, and he says, 'I have got something else to do,' and he says, 'You can't do a thing with it. It is all over.' In substance, 'I am done,' and I says, 'Very well, that ends it.' That was my acceptance of his resignation."

Long did not believe plaintiff had any employment waiting for him, and plaintiff has not yet revealed what the prospective job was. But Long did not wish to lose the services of plaintiff, whom Long regarded as a useful man, and Long said he would try to find a place for plaintiff with the company at some other location. Plaintiff testified as follows:

"He says, 'I will go back to Oklahoma and see Mr. Hinde,' and he says, 'I will take care of you; I will take this proposition up for you myself.' That is just what Mr. Frank Long himself told me. He said if I couldn't get along here, that they had innumerable towns where they sold gas, and they could place me in some other place, is what he said. Later, I went to Tulsa, Okla., and went in and talked to him again, and he said he was trying to make arrangements, and for me to come back to Iola and stick around; that I would be paid, and that he was trying to get hold of Mr. Hinde [field manager], but that he was in the East, and that when he returned he would have some news for me."

Long did make an effort to find a place for plaintiff, but was not successful. Meantime plaintiff was paid for the month of June.

Before June 9 plaintiff went to Tulsa and had the interview with Long to which plaintiff referred. The testimony concerning what occurred is conflicting. Long testified as follows:

"The substance of that conversation was, he came down and said he wanted to withdraw his resignation, and I told him I was very sorry, that I had been doing the best I could around every place I could think of, and there wasn't anything else available, and that I would certainly help him all I could. I did not at any time agree that Mr. Griffin might withdraw his resignation."

On June 9 plaintiff wrote a letter to Long, reading in part as follows:

"I have just returned from Wichita, and I am a bit surprised upon my return not to hear from you. Following your advice, I am sticking around until July 1, awaiting a turn in events, and I trust there is a turn for the better."

Plaintiff's title had been district superintendent. He testified he did not act in that capacity after June 1, and gave testimony abstracted as follows:

"That he never went down to the office to do any work after the first of July; . . . That he was still 'sticking around' waiting for some money that was due him. That he expected to sit around and do nothing for ninety days, and have the Oklahoma Natural Gas Corporation continue to pay him.

"That he never had a conversation at Tulsa with Mr. Long in which he wanted to recall his resignation. That he did not ever resign other than was stated in his letter [of May 7]. That at the time he had the conversation with

Mr. Long at the warehouse in Iola and his conversation in Tulsa, Mr. Long never accepted his resignation of May 7, 1928. That his conversation with Mr. Long was that he told him to come back to Iola and stick around, and he [Mr. Long] would iron out the situation for him.

. . . . . . . . . . . . . . . .

"By the Court: Let me have it [the letter of June 9]. Here: 'I am sticking around until July 1, awaiting a turn in events, and I trust there is a turn for the better.' Now what was meant by that? Until July 1. Were you to quit then? Were your services terminated then, or what was there about July 1? A. He told me that by July 1 he could tell me something definite.

"Q. All right, now: 'Awaiting a turn in events.' That was when the turn in events was to take place? July 1? A. Yes, sir.

"By the Court: And you say, 'I trust there is a turn for the better.' Now what did you mean by a turn for the better? Was it to be to move, or go ahead, or what? A. Why to go on, of course.

"By the Court: No, no. Where were you to go, or what were you to do, or was it indefinite? That's the question. Was there any promise made you by Mr. Long? A. All Mr. Long said was that he would take care of me.

"By the Court: Well, you say, 'I trust there is a turn for the better.' Now what was meant by that? That is what I want to get at. It looks to me like there was a storm, and heavy black clouds settling, and you wanted that thing to clear up, and get it out of the road. In other words, if it didn't why everything was off; is that right? A. Yes, sir.

"By the Court: All right. Then there wasn't any assured promise by Mr. Long, made to you with any degree of certainty, that you were to continue on after July 1 in any job at all? A. No, sir."

Notwithstanding "everything was off," on July 23 plaintiff wrote to Long that plaintiff would insist on the agreement for ninety days' notice of discharge.

Previous to August 21, 1928, plaintiff negotiated a contract with the city of Iola, for a company in competition with defendant, to furnish gas to the city. The contract was signed on August 21, and was of such a character that plaintiff could not have remained in employment by defendant. The result of plaintiff's activity in his own behalf was that he received around $3,000 net; afterward he said $2,500. He testified he made a profit out of it about the latter part of November. Afterward he said he received his profit in January or February, 1929.

The trial was by the court, and judgment was rendered for the amount of plaintiff's salary at $250 per month for July, August, and September, 1928. When judgment was rendered, the court read a memorandum opinion which contained some findings of fact. It also contained the following discussion of the subject of mitigation of damages:

"Had he secured some employment at a stipulated salary, it might be used by the defendant in mitigation, but not being employed, and as the court gathered from the evidence, the enterprise being only speculative, the defendant is not entitled to participate therein, nor in any of the profits realized therefrom. Had the matters involved produced a loss on the part of Griffin, the company would, no doubt, not have been held liable for that loss, and of course, not being liable for any loss he might have incurred by any speculation, then how could they have profited thereby? In other words, they cannot eat their cake and keep it."

The court misconceived the subject discussed. It was not essential to diminution of damages that plaintiff procure employment at a stipulated salary. Plaintiff had been in the natural gas business for twenty-six or twenty-seven years, and had occupied positions of authority and responsibility for various employers extensively engaged in gas production and distribution; and there was no evidence that the business plaintiff engaged in on his own account was speculative, or was such that a reasonable person of his qualifications and experience would not engage in it. No question of defendant's participation in profits or liability for loss was involved, and no question of defendant's eating its cake and keeping it was involved.

Plaintiff claimed he was entitled to ninety days' notice of discharge, was discharged on July 1 without notice, and hence was entitled to his salary at $250 per month up to October 1. Such is not the law. He was entitled to damages for breach of contract, whatever his damages might be. *Prima facie*, his damages would be $750, but that sum would be only *prima facie* his damages. The sum would be reduced by whatever he earned, or with reasonable diligence could have earned, by reasonable employment of the ability and energy which, but for the discharge, would have been devoted to defendant's business. Usually it is said that it is the "duty" of the person wrongfully discharged to mitigate damages. This court has heretofore explained that use of the word "duty" in this connection is incorrect. The discharged employee is privileged to work or not, as he sees fit, but he rests under a disability to claim damages which he might have prevented:

"According to this classification [Hohfield's classification of jural relations], which appears to be sound, and which, if observed, ought to conduce to clarity of thought and precision of expression, the defendant rested under no *duty* to the plaintiff to mitigate damages by using the flour to the best advantage. If so, he himself would have been subject to an action for damages resulting from breach of the duty. The correct statement would be that the defendant rested under legal *disability* to counterclaim for damages.

which he might have prevented." (*Rock v. Vandine,* 106 Kan. 588, 590, 189 Pac. 157.)

The subject was recently treated by Cardozo, Ch. J., in his concurring opinion in *McClelland v. Climax Hosiery Mills,* 252 N. Y. 347 (1930):

"Upon a wrongful discharge of a servant during the term of employment, the *prima facie* measure of damage is the wage that would be payable during the remainder of the term [citations]. This is only the *prima facie* measure. There is no fixed and certain obligation on the part of the master to respond in damages for that amount. The obligation of the master is merely to pay whatever damages have actually been suffered, and these exclude damages that a servant, acting reasonably, would have diminished or avoided. . . . The servant is free to accept employment or reject it according to his uncensored pleasure. What is meant by the supposed duty is merely this, that if he unreasonably reject, he will not be heard to say that the loss of wages from then on shall be deemed the jural consequence of the earlier discharge." (pp. 358, 359.)

The result of the foregoing is that breach of contract of employment is to be redressed as injuries in other relations are redressed. In the case of *K. P. Rly. Co. v. Mihlman,* 17 Kan. 224 (1876), the railway company dug some ditches on Mihlman's land. Instead of filling them up and recovering damages at once, Mihlman stood by for several years, until he lost a wheat crop. The syllabus reads:

"After a wrong has been committed, it is the duty of the injured party to make reasonable efforts to prevent an increase or extension of the injury, and if he fails to do so, he cannot recover for such increased injury." (¶ 5.)

The action in *Town Co. v. Leonard,* 46 Kan. 354, 26 Pac. 717, was one for damages for breach of contract to move a house. In the opinion it was said:

"The plaintiff could not sit idle an indefinite length of time and safely count on the recovery of $150 per month as damages. If there was a breach of the contract, it was his duty, upon learning of it, to at once remove the building, or employ others to do so, and charge the cost of the removal to the town company." (p. 358.)

In *Lawson v. Brokmann,* 116 Kan. 102, 226 Pac. 252, a hay baler was wrongfully attached. The owner claimed large damages for loss of profits on contracts to bale hay. This court said that if he had such remunerative contracts, or could have procured them, he should have given bond for release of his baler, or rented a baler, or bought one. The principle has been applied in numerous other cases decided by this court.

The principle under discussion was applied in England, in the case of *Staniforth v. Lyall,* 7 Bing. 169 (1830). Defendants chartered a vessel to go to New Zealand, where the vessel was to be loaded, and the cargo carried to England. If defendants' New Zealand agent gave notice that transportation of cargo was abandoned, the vessel owner was to receive 500 pounds. The owner went to New Zealand and found neither cargo nor agent. The owner returned to England by a circuitous route at his own risk, and earned above all expenses enough to make the voyage much more profitable than the original venture would have been. It was held he could not recover the 500 pounds, and a verdict in his favor for a shilling was affirmed.

The leading case in England is that of *British Westinghouse Electric and Manufacturing Company, Limited, v. Underground Electric Railways Company of London, Limited,* A. C. 673, L. R. 1912, decided by the House of Lords. A contract provided for the furnishing of machinery. The machinery furnished was defective. After a time new machinery was purchased, and the pecuniary advantages to the purchaser on account of the efficiency and economy of the new machinery more than offset the damages for breach of contract. It was held the pecuniary advantages should be taken into account. The following are extracts from the opinion delivered by Lord Chancellor Haldane:

"The fundamental basis is thus compensation for pecuniary loss naturally flowing from the breach; but this first principle is qualified by a second, which imposes on a plaintiff the duty of taking all responsible steps to mitigate the loss consequent on the breach, and debars him from claiming any part of the damage which is due to his neglect to take such steps. In the words of James, L. J., in *Dunkirk Colliery Co. v. Lever,* 1878, 9 Ch. D. 20, 25, 'The person who has broken the contract is not to be exposed to additional cost by reason of the plaintiffs not doing what they ought to have done as reasonable men, and the plaintiffs not being under any obligation to do anything otherwise than in the ordinary course of business.'

"As James, L. J., indicates, this second principle does not impose on the plaintiff an obligation to take any step which a reasonable and prudent man would not ordinarily take in the course of his business. But when in the course of his business he has taken action arising out of the transaction, which action has diminished his loss, the effect in actual diminution of the loss he has suffered may be taken into account even though there was no duty on him to act.

"*Staniforth v. Lyall* [7 Bing. 169, supra] illustrates this rule. . . ." (p. 689.)

"I think that this decision illustrates a principle which has been recognized in other cases, that, provided the course taken to protect himself by the plaintiff in such an action was one which a reasonable and prudent person might in the ordinary conduct of business properly have taken, and in fact did take whether bound to or not, a jury or an arbitrator may properly look at the whole of the facts and ascertain the result in estimating the quantum of damage. . . . .

"I think the principle which applies here is that which makes it right for the jury or arbitrator to look at what actually happened, and to balance loss and gain." (pp. 690, 691.)

We have here criteria for the solution of all similar damage cases, and they were employed in determining a case involving breach of contract of employment, first by the appellate division for Ontario of the supreme court of Canada, and on further appeal, by the supreme court. (*Cockburn v. Trusts and Guarantee Co.*, 33 D. L. R. 159; 37 D. L. R. 701.) Plaintiff was employed as sales manager for a manufacturing company for five years, at a salary of $5,000 per year. The company went into liquidation while the contract had two years to run. Plaintiff purchased assets of the company at a price of $36,000, which he sold in a few months at a profit of $11,000. The syllabus of the decision by the appellate division reads:

"In an action for damages for breach by a master of a contract of employment profits earned by the servant after the breach, in a transaction arising out of or in consequence of the breach, during the time and with the abilities which would otherwise have been given to the master's service, should be deducted from the salary payable under the contract, in order to assess the damages, even though the transaction has necessitated the investment of capital by the servant and the pledging of his assets." (33 D. L. R. 159.)

In the opinion it was said:

"It is said that anything that shews that the respondent is not actually out of pocket must be considered in assessing damages. I think that the latter is much too broad a statement, and that it must be modified by eliminating everything that lies outside the idea that the respondent is in some way forced to do something caused by the breach of contract, thus mitigating the results which flow from its breach. If, for instance, immediately after dismissal, the respondent had fallen heir to an estate producing $5,000 a year, or had by a lucky chance speculated in stocks and made a large amount, or if he spent the time which was not previously occupied in his lost employment so profitably as to bring him a good income, then each of these would be something quite apart from the contract and in no way related to its performance or nonperformance. But, if his time and ability which he had exchanged for a salary are, upon his employment ceasing, devoted to producing an income to take the place of that salary, whether by way of sale and purchase, commission, or

otherwise, then it seems to me very difficult to suggest any reason why the amount he realizes from the employment of those very same two factors should not be treated as something to be set off against the damages." (p. 163.)

The opinion of the supreme court of Canada contained the following:

"The action of the appellant in acquiring and disposing at a profit of a considerable part of the manufactured stock of his former employers arose out of his relations with them. It involved the employment by him of time, labour and ability which he had engaged to give to them. For his loss of an opportunity to use these in earning a salary from those employers he is now asking that the respondent shall be compelled to pay by way of damages. It would seem to be manifestly unfair that, if the appellant is thus to be remunerated on a contractual basis by way of damages, he should not be held accountable in mitigation for money made by using for his own purposes the time, labour and ability so to be paid for. The $11,000 profit which he made, although the making of it required some assumption of risk and responsibility and also an expenditure clearly beyond anything involved in his engagement by his former employers, and likewise beyond anything which it was his duty to them, or to the respondent, to undertake, is within the rule of accountability stated by Lord Haldane." (37 D. L. R. 701, 704.)

In the case of *Huntington v. The Ogdensburgh and Lake Champlain Railroad Co.*, 33 How. 416, the station agent of a railway company, employed at a salary of $100 per month, was discharged. He sued for salary for one month. After he was discharged he joined others in the operation of a brick yard. The syllabus reads:

"If the plaintiff seeks and finds employment, as seems to be his legal as well as his moral duty, then the damages he would be otherwise entitled to recover, by reason of the breach, is to be diminished or regulated by his actual loss, depending upon the actual value to him of the benefits obtained, or to be obtained, from such new employment."

Other New York cases to the same effect are: *Toplitz v. Ullman*, 20 N. Y. S. 863; *Richardson v. Hartman*, 68 Hun 9.

In the case of *Gates v. School District*, 57 Ark. 370, a superintendent of city schools was discharged before the term of employment ended. He moved to a farm, and earned a considerable sum by reason of his labor on the farm and benefits derived from it. The syllabus reads:

"Where, after his wrongful discharge, plaintiff removed from the city to country, and engaged in work upon his own farm that was incompatible with the performance of the services he had undertaken, the school district is entitled to a reduction of the damages to the extent of the value of such work." (¶ 4.)

The following decisions are in accord: *Perry v. Simpson Waterproof Manf. Co.*, 37 Conn. 520; *Fuller v. Little*, 61 Ill. 21; *Redfield v. Boston P. & M. Co.*, 183 Ia. 194 (which distinguishes between income obtained from employment, and income from rents, investments, etc.); *Jaffray et al. v. King*, 34 Md. 217 (rule recognized, proof insufficient); *Lee v. Hampton*, 79 Miss. 321; *Kramer v. Wolf Cigar Stores Co.*, 99 Tex. 597. Contra: *Harrington v. Gies*, 45 Mich. 374.

In the Texas case the headnote reads:

"In estimating damages occasioned by the wrongful discharge of plaintiff before the end of his term of employment, he is held to the exercise of reasonable diligence to obtain other employment of substantially the same character, if procurable, and if not, then other employment for which he was fitted, his probable earnings therein to be deducted from his damages for wages lost by discharge. Only in case such employment was not procurable would question arise as to the value of his services to himself in an independent business venture engaged in by him meantime. And this value would not be the wages he would have had to pay another to render the same services, but the pecuniary value his services yielded him in the business." (p. 597.)

In this instance, at some time before August 21, plaintiff devoted his time and talents to an enterprise of his own, incompatible with service to defendant. The result was that within a short time after October 1, the date when plaintiff claimed his term of service for defendant expired, he had a net profit of $3,000 or $2,500. The result is, the pecuniary benefit of his services to himself previous to October 1 should be taken into account in determining quantum of damages. There is nothing speculative about the result of plaintiff's competitive enterprise. He has balanced receipts and expenditures and stated profit. It is idle to say that what he had done up to October 1 was valueless, and by considering the whole of the facts, after the event, as Lord Haldane recommended, any experienced gas distributor can tell the value to plaintiff of what he had accomplished by October 1.

Plaintiff pleaded he was discharged. When judgment was rendered the court found plaintiff was notified by Ulrich that his services would not be needed after July 1. There was no evidence of such notification, and in a second memorandum opinion, filed when the motion for new trial was denied, the court struck out the finding. The court then based judgment on a ground not pleaded—that Ulrich created a condition which justified plaintiff in leaving defendant's service. In support of this position the court said the first

thing Ulrich did was to reduce plaintiff's salary from $300 to $250 per month. There was no evidence that Ulrich reduced plaintiff's salary to oppress or harass plaintiff, and the evidence on the subject was that the cut was made pursuant to a general reduction in salaries everywhere.

In the memorandum opinion the court considered but one tender of resignation, that contained in plaintiff's letter of May 7, to take effect June 1. The court said that resignation was not accepted. Acceptance of resignation applies only to public officers. The tender of resignation to take effect June 1 was not accepted, and the court's mind was fixed on that resignation. That resignation was not discussed or accepted at the warehouse conversation between plaintiff and Long, but if Long's testimony was true, the plaintiff then and there withdrew from defendant's service. When Long was trying to testify that he accepted the warehouse resignation the court said:

"No, no, you didn't. You can't get by with that with me. Now you paid him for the month of June, and if his resignation was effective as of June 1, you didn't owe him anything for the month of June. Now you gentlemen understand the rule of preponderance of the evidence, and there has got to be something that will overturn that salary check for June besides just talk; something more than talk. If there is anything to accepting the resignation as of May 7, then that salary check was just a donation to charity. You had just as well have given it to charity. The Salvation Army would have made a better go out of it."

The testimony of Long was very clear, and the testimony of plaintiff quite plainly indicated that the check for June was given plaintiff to retain him while Long was endeavoring to find some place to which plaintiff might be transferred. By cross-examination of plaintiff the court itself developed the fact that there was no assurance plaintiff would continue after July 1, and if he did not "everything was off."

Because of a general finding for plaintiff, the case would ordinarily be returned to the district court for new trial of the issue of damages only; but in view of the matters just discussed, and others, the court is of the opinion there should be a new trial generally.

The judgment of the district court is reversed, and the cause is remanded with direction to grant a new trial.

SLOAN, J., not participating.