No. 41,049

Arthur Creten, *Appellee*, v. Chicago, Rock Island and Pacific Railroad Company, a Corporation, *Appellant*.

(337 P. 2d 1003)

Opinion filed April 11, 1959.

*Clayton M. Davis,* of Topeka, argued the cause, and *Thomas M. Van Cleave, Willard L. Phillips, Patrick B. McAnany* and *Thomas M. Van Cleve, Jr.,* all of Kansas City, and *Mark L. Bennett,* of Topeka, were with him on the briefs for appellant.

*Leonard O. Thomas,* of Kansas City, argued the cause, and *J. E. Schroeder, Lee E. Weeks, J. D. Lysaught, Richard Millsap, Robert H. Bingham* and *Ervin G. Johnston,* all of Kansas City, were with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: This was an action for damages arising out of the collision between a Rock Island passenger train and an irrigation pump mounted on a two-wheel trailer owned by the plaintiff, Arthur Creten. George Scott, Marvin LaRue, the Union Pacific Railroad Company and the Chicago, Rock Island and Pacific Railroad Company were named defendants. Service of summons was not made on Scott and neither he nor LaRue were operating the train at the time of the collision. LaRue's demurrer to plaintiff's evidence was sustained and the propriety of that ruling is not before us. The jury returned a verdict for plaintiff and against the Chicago, Rock Island and Pacific Railroad Company (defendant), and did not find the Union Pacific guilty of negligence. Following the overruling of post-trial motions, the defendant has appealed.

Summarized in part, the allegations of the amended petition were that on July 4, 1954, the defendant and Union Pacific jointly owned, maintained and operated tracks and crossings in Wyandotte County, Kansas, and operated trains thereon; that one such crossing was located on the south side of Kansas Highway 32, which runs parallel to the railroad right of way about a mile east of Muncie, which was built and established by defendant and Union Pacific some 30 years ago as a private crossing, but since then has been used by the public generally and by the plaintiff to gain access to a field which he rented on the south side of the tracks; that on the day in question the defendants were maintaining the crossing, but it was in a state of disrepair and had been for many months in that there were large holes and depressions between the planks and rails, and that defendants knew or in the exercise of reasonable care should have known it was in such a state.

It was further alleged that on the morning in question Billy Crispin, an employee of the plaintiff, left plaintiff's farmyard driving a tractor pulling a Hercules pump mounted on a two-wheel

rubber tired trailer, intending to pull the pump to the Kansas River for the purpose of pumping water from the river to irrigate a field of growing crops owned by plaintiff and grown in the field south of the tracks; that, as Crispin approached the crossing, there was no train in sight and he proceeded to cross the crossing but in so doing and after the tractor cleared the north or westbound main line track, the rough and uneven planking caused the tongue of the trailer to come loose from the tractor and the trailer with the pump attached thereto became stalled on the crossing; that after the trailer became loose, Crispin noticed a Rock Island train approaching from the east, which was then more than a mile east of the crossing; that the day was clear, there was no curve in the track and the stalled trailer standing on the track was clearly visible to the engineer and fireman operating the train and was seen by them, or should, in the exercise of the lookout required to be maintained by them, have been seen when the train was more than a mile east of the crossing; that Crispin dismounted from the tractor which he had parked south of the tracks and attempted to pull the trailer from the crossing by hand, but was unsuccessful; that these efforts were clearly visible to the engineer and fireman; that, notwithstanding these facts, the train approached the crossing at a speed of 80 miles per hour and did not at any time slacken speed; that the engineer and fireman could and should, in the exercise of ordinary and reasonable care, have stopped the train after they saw, or in the exercise of ordinary and reasonable care, should have seen the trailer stalled on the crossing and could and should, in the exercise of reasonable care, have avoided the collision; that they were keeping no lookout along the track in front of the train as they approached the crossing and that it was their duty to keep such a lookout and to have stopped after they saw or should, in the exercise of ordinary and reasonable care, have seen the trailer stalled on the crossing and that as a result of their negligence, the train struck the pump and trailer and demolished them.

Plaintiff further alleged that a drouth occurred in the summer of 1954 and on July 4, the crops planted by him in the field to be irrigated were in need of immediate water; that plaintiff had no other pump with which he could irrigate the crops and was unable to obtain another, and as a result, the crops withered and died.

Defendant and Union Pacific answered denying the allegations of the plaintiff's petition and alleged that any injury or damage sustained by plaintiff was solely and proximately caused by his carelessness and negligence or that of his employee, Crispin, and

further, that plaintiff failed to take appropriate measures to prevent or mitigate any damage which he may have suffered to his growing crops.

Plaintiff's reply denied all allegations in the answers inconsistent with those alleged in his petition.

With the issues thus joined, trial was by a jury which returned its verdict in favor of plaintiff for $10,000, and made answers to special questions, as follows:

"Question No. 1: On July 4, 1954, was the crossing where the collision occurred a private way across the railroad tracks for the convenience and use of the owners and tenants of the land immediately south of the railroad tracks? Answer: Yes.

"Question No. 2: At what rate of speed in miles per hour was the train traveling immediately prior to the time the brakes on the train were applied? Answer: 60-65 m. p. h.

"Question No. 3: Traveling at the rate of speed given in the answer to Question No. 2, in what distance could the train be stopped by a maximum service application to the train brakes? Answer: 1970 feet.

"Question No. 4: How far east from the point of collision was the front end of the train when the brakes were applied? Answer: 700 feet.

"Question No. 5: How far from the crossing where the collision occurred was the front of the train when the engineer realized, or in the exercise of due care under the circumstances should have realized the pump could not be removed from the track where the collision occurred? Answer: 1445 feet.

"Question No. 6: If you find the Chicago, Rock Island & Pacific Railroad Company guilty of any negligence, then state specifically of what such negligence consisted. Answer: Negligence by engineer not seeing pump in time.

"Question No. 7: If you find the Union Pacific Railroad Company guilty of any negligence, then state specifically of what such negligence consisted. Answer: (No answer.)

"Question No. 8: If the plaintiff or his employees had provided an adequate safety hitch in addition to the draw-bar connection between the tractor and the trailer pump, could the pump have been removed from the tracks before the collision occurred? Answer: No.

"Question No. 9: Was plaintiff Arthur Creten negligent? Answer: No.

"Question No. 10: Was Billy Crispin negligent? Answer: No.

"Question No. 11: Was the collision an unavoidable accident? Answer: No.

"Question No. 12: Could Mr. Creten, in the exercise of due diligence under all of the circumstances have rented or purchased a pump with which to irrigate his field and thereby have avoided loss of his crops? Answer: Yes.

"Question No. 13: If your verdict is for the plaintiff, then state the amount of the damages, if any, you allow for:

| | | |
|---|---|---|
| "(a) Damages to the pump. | Ans. | $1600 |
| "(b) Damages to the cucumber crop. | Ans. | $4500 |
| "(c) Damages to the turnip crop. | Ans. | $ 100 |
| "(d) Damages to the squash crop. | Ans. | $2000 |
| "(e) Damages to the field corn crop. | Ans. | $ 800 |
| "(f) Damages to the sweet corn crop. | Ans. | $1000" |

The defendant has appealed from the orders of the trial court overruling its demurrer to plaintiff's evidence; its motion for a directed verdict; its motion for judgment upon the special questions; its objection to the admission of certain evidence offered by plaintiff; its motion to require plaintiff to elect between the theory of last clear chance and the theory of primary negligence as a basis for recovery; its motion to set aside special findings of the jury numbered 13 (b), (c), (d), (e) and (f); its motion to conform the jury's verdict and the amount thereof to special finding 13 (a), and its motion for a new trial. Defendant also specifies as error the trial court's refusal to give certain requested instructions, and the giving of certain instructions objected to by the defendant. While eleven separate specifications of error are assigned, the defendant has briefed and discussed them under five main points. Those necessary to a decision will be discussed in the order they appear in defendant's brief.

The evidence disclosed by the record is as follows: The defendant operates its trains over the tracks of the Union Pacific between Kansas City and Topeka. Signals regulating the movement of trains are maintained by Union Pacific. The train here involved left Kansas City on the morning of July 4, 1954, going toward Topeka. It consisted of fourteen cars and a Diesel locomotive of three units. Clarence F. Kraus was the engineer and Lawrence J. Harms was the fireman. Trains leaving Kansas City going west pass through the Muncie area.

At the crossing where the pump was struck, there are four tracks; two main lines (east and west), a passing, or middle, track, and a business track. This crossing is located about 700 feet west of what is known as the Kansas Avenue (Muncie) crossing where Kansas Highway 132 crosses the tracks. (Highways 32 and 132 are different highways.) The yard limit leaving Kansas City is approximately three miles east of the Muncie crossing and the Ferry crossing is three-quarters of a mile east of the Muncie crossing. Thus, there are two crossings between the yard limit and the crossing where the collision occurred. The tracks are straight, level and unobstructed for about 1.9 miles east of the crossing in question except for cars passing over the tracks at the Ferry and Muncie crossings. The Bishop Lumber Company has several buildings located on the north portion of the right of way on both sides of the crossing in question, and plaintiff's farmyard is located north of Highway 32 and west of that crossing. In 1954 plaintiff was renting a tract of bottom land which was south of the Union Pacific right of way and east of his farmyard.

The crossing in question was maintained and kept in repair by the Union Pacific, and plaintiff had used it for eight or ten years to get to and from the rented land. On July 4, 1954, there were fifteen acres of cucumbers, fifteen acres of turnips, twenty acres of squash, twenty acres of field corn and about ten or fifteen acres of sweet corn planted in the field. Plaintiff had waited as long as he could, thinking it might rain and he wouldn't have to irrigate, but since it had not rained and the crops needed water, he pulled the irrigation pump out of the shed so that it could be hooked up to the tractor and pulled to the field. Bob Creten, plaintiff's son, hooked the pump up to the tractor and Billy Crispin, an employee of plaintiff's, drove the tractor to the field.

The pump was about 62 inches wide, 62 inches long, and 61 inches high and weighed about 1500 pounds. It was balanced on the trailer so that one man could lift the tongue and hook it to a drawbar. The pump was painted a bright yellow, which is the best color for long distance visibility. There was no safety chain or hitch on the pump; the only way it was attached to the tractor was by the drawbar connection. If there had been such a safety hitch the pump could have been moved off the track before the collision occurred even though the drawbar connection had broken.

Billy Crispin testified that, on the morning in question, he left plaintiff's farmyard driving the tractor with pump attached and went south to Highway 32 where he turned east and went along the highway for about one-quarter of a mile then turned south to go over the crossing in question to the field where they were going to irrigate. When he reached the crossing he stopped and looked both ways but saw no trains coming. As he started across the tracks, the tractor lunged and jerked and the pump came loose from the tractor. He looked and saw the train coming from around the bend about 1.9 miles east of the crossing so he took the tractor on across the tracks to the south to get it out of the way, got off and went back to push the pump off the track, but was unsuccessful since the wheels of the trailer were between the two rails. He further testified that when the train was still about three-quarters of a mile away he ran down the track toward it waiving his arms with his hat in his hand. He could not tell that the train appeared to slacken speed. However, on cross-examination, he admitted he made and signed a statement to the effect that, "I did not try to flag the train at all because I did not have time," and, "I got on the opposite side of the track from where the train was going to hit the pump, and got myself into the clear." To the best of his

knowledge the bolt or pin in the coupling between the tractor and pump broke and that was why it came loose from the tractor.

Bob Creten testified that he hooked the trailer up to the tractor by putting a bolt down through a clevis on the tongue of the trailer and screwing a tap on it; that he went to the field in a truck and crossed the tracks ahead of Crispin; that when he was about a quarter of a mile out in the field he saw Crispin waving, so he turned around and hurried back; that when he was about half way he saw Crispin run down the track waving his hands; that the train was then at the Muncie crossing, and in his best judgment it stopped about a quarter of a mile west of the crossing after striking the pump. He also testified that on July 4, they were getting ready to irrigate the crops and that it took four or five days working around the clock to put an inch of water on the field; that they were going to pump the water from the Kansas River, which is about 50 feet below the level of the field, and to do this, they put the pump down over the bank to the edge of the water with a big cable and the tractor. He was allowed to state, over defendant's objections, that about four or five days after the 4th of July the crops were ir such a state that the putting of water on them would not have done any good.

Arthur Creten testified that the pump was completely demolished and he did not have another one that he could put down in the river; that he had a conversation with Jack Clark, who was in the business of selling irrigation pumps and had sold the pump to plaintiff, about getting another pump but Clark didn't have one on hand and could not get one for three days, and that he did not get another pump. The crops were completely burned up about three or four days after July 4, and he got nothing in the way of crops off the field. He further testified that the pump was worth $2,000 and that the market value of the crops on July 4, were as follows: the cucumbers, $700 an acre; the squash, $200 an acre; the field corn, $75 an acre and the sweet corn, $100 an acre. Defendant's objection to the admission of this testimony on the ground that the crop damages were too remote and speculative were overruled. On cross-examination plaintiff was asked if he had called any of the thirty-some irrigation equipment dealers listed in the Kansas City telephone directory in an attempt to locate another pump, and he replied that he had not.

Kimball K. Backus testified as an expert witness on behalf of plaintiff that the market value of the crops per acre was $600 for the cucumbers, $250 for the squash, $75 for the field corn, and $150

for the sweet corn. Defendant made the same objection to the testimony as was made to that of plaintiff, and it was overruled.

Clarence F. Kraus testified for the defendant that on the morning of July 4, he was the engineer on the train involved in the collision and was traveling about 65 miles an hour when he reached the Muncie crossing. He saw a man (Crispin) on the tracks when he was between the Ferry and Muncie crossings but was not concerned at that time because he assumed the man would get off the track, and because there was considerable traffic over the Muncie crossing that he had to watch. Also, there were some small boys playing along the track. When he reached the Muncie crossing he saw the man was not getting off the track so he made a full service application of the brakes, but did not put the train's brakes in emergency because he might have injured some of his passengers. He did not see the pump until the man got off the track and, at that time, he was about 200 or 300 feet from it. His attention was focused on the actions of the man. He did not notice anyone running down the track toward the train waving his arms or otherwise trying to flag him, and that he kept a vigilant lookout on the track in front.

The testimony of the fireman was substantially the same as that of the engineer.

Two irrigation equipment dealers, Peter S. Cuica and C. D. Jensen, testified for the defendant that on July 4, they had irrigation pumps on hand and could have made immediate delivery to the plaintiff. Each stated his company was listed in the classified section of the Kansas City telephone directory and he could be reached on Sundays or holidays, and that pumps could be purchased or rented.

The undisputed evidence was that July 4 was on Sunday and July 5 was a holiday. In addition, the evidence showed and, for the purposes of this appeal, plaintiff concedes, that the crossing where the collision occurred was a private, not a public, crossing.

Defendant first contends that the trial court erred in overruling its demurrer to plaintiff's evidence, or its motion for directed verdict should have been granted because the evidence showed plaintiff to be guilty of contributory negligence as a matter of law and because the evidence was insufficient to prove a cause of action based upon either the theory of primary negligence or last clear chance.

As preliminary to discussing defendant's contention, we note the oft repeated rules in this jurisdiction that: (1) In testing the suf-

ficiency of evidence as against a demurrer, the court shall consider all the plaintiff's evidence as true, shall consider that favorable to plaintiff, together with all reasonable inferences to be drawn therefrom and disregard that unfavorable to plaintiff, and shall not weigh any part that is contradictory nor weigh any differences between the direct and cross-examination, and if so considered, there is any evidence which supports or tends to support plaintiff's case on any theory, the demurrer should be overruled. (*Drake v. Moore,* 184 Kan. 309, 336 P. 2d 807, and cases therein cited.) (2) Where the defendant demurs to plaintiff's evidence, and after the demurrer has been overruled, proceeds to introduce his own evidence, he may cure any insufficiency of plaintiff's evidence and at the close of all of the evidence, its sufficiency to go to the jury must be determined by a consideration of the evidence introduced by both the plaintiff and the defendant (*Ziegelasch v. Durr,* 183 Kan. 233, 235, 326 P. 2d 295; *In re Estate of Rogers,* 184 Kan. 24, 334 P. 2d 830, and cases therein cited). (3) In determining whether a plaintiff is guilty of contributory negligence when tested by demurrer, the question must be submitted to the jury if the facts of record are such that reasonable minds, in the exercise of fair and impartial judgment, might reach different conclusions thereon and, further, the question whether a negligent act is the proximate cause of an injury, and whether an ordinarily reasonable, prudent man would have seen that injury might occur as a result of the negligent act, is also a question of fact for the jury. (*Drake v. Moore,* supra, and cases therein cited.)

With these principles in mind a brief review of the evidence shows that the engineer and fireman had a clear and unobstructed view in front of the train for a distance of 1.9 miles and that the track was straight and level for that distance. Plaintiff's bright yellow pump had become stalled on a private crossing between the rails of the track upon which the train was approaching. Neither the engineer nor the fireman saw the pump until they were 200 or 300 feet away from it and neither saw Crispin attempting to flag the train. The train struck the pump and totally destroyed it.

The defendant first argues that G. S. 1949, 8-5,118, which provides,

"When one vehicle is towing another the drawbar or other connection shall be of sufficient strength to pull, stop and hold all weight towed thereby . . . (*b*) In addition to the drawbar connections between any two such vehicles there shall be provided an adequate safety hitch . . ."

is applicable, and, since plaintiff did not provide an adequate safety hitch, he was guilty of contributory negligence as a matter of law.

It further argues that since the trailer became stalled on the track after the tractor jerked and lunged either one or both of two things occurred: Crispin carelessly drove or handled the tractor so as to cause it to lunge and jerk, thereby breaking the drawbar connection, or he so drove and operated the tractor that the trailer was on only part of the crossing and down between rails that were too high, and in either event, this was contributory negligence as a matter of law.

G. S. 1949, 8-5,118 is part of the vehicular code originally enacted as Ch. 283, Sec. 118, L. 1937. Section 2 (G. S. 1949, 8-502) of the same chapter provides that "the provisions of this act relating to the operation of vehicles refer exclusively to the operation of vehicles upon highways" with certain exceptions which are not material to this appeal. Section 1 (G. S. 1949, 8-501) defines a highway as "the entire width between property lines of every way or place of whatever nature when any part thereof is open to the use of the public, as a matter of right, for purposes of vehicular traffic," and defines a private road or driveway as "every way or place in private ownership and used for vehicular travel by the owner and those having express or implied permission from the owner, but not by other persons." Thus, G. S. 1949, 8-5,118 applies only to vehicular traffic upon the public highways and not to traffic on private property. We are not confronted with the question whether plaintiff would be guilty of contributory negligence as a matter of law in having violated the statute by traveling upon Highway 32 without the required safety hitch since the undisputed evidence showed that the crossing where the collision occurred was a private crossing which plaintiff used with the implied permission of Union Pacific. The question is whether plaintiff violated the statute while on private property and thus was guilty of contributory negligence as a matter of law. As we have seen, the act itself provides that it is only applicable to the operation of vehicles upon highways. In *Smith v. Bassett*, 159 Kan. 128, 152 P. 2d 794, the court said:

"Appellant insists that since the accident occurred on private property the case is not governed by the general rules pertaining to traffic on public roads. Clearly statutes relating specifically and solely to the operation of vehicles on public highways do not pertain to the operation of vehicles on private property. . . ." (l. c. 132.)

We conclude the statute was inapplicable to the private crossing, and that plaintiff was not guilty of contributory negligence as a matter of law by failing to provide an adequate safety hitch.

As to whether Crispin was guilty of contributory negligence, that was a question upon which reasonable minds could differ and was therefore a question for the jury. (*Drake v. Moore*, supra.)

Was the evidence sufficient to establish actionable negligence based on the theory of either primary negligence or last clear chance? Defendant argues that the relationship of the plaintiff and his employees to the railroads in the use of the private crossing was no more than that of a bare licensee with permission to cross the track; that the license to cross was not a license to stop on and obstruct the track; that when plaintiff caused the pump to stop and remain on the track he was beyond the scope of his license and became a trespasser so that the defendant owed him no duty except not to wantonly injure him and owed no duty to maintain a lookout, and since the evidence did not show wanton conduct on the part of defendant there was no violation of a duty owed to him. Hence, defendant concludes plaintiff failed to establish actionable negligence and the demurrer and motion for directed verdict should have been sustained. While the question of the degree of care a railroad company is required to exercise in the operation of its train over a private crossing was argued in *Strauss v. Missouri Pacific Rld. Co.*, 175 Kan. 98, 102, 103, 259 P. 2d 145, it was expressly not passed upon, and our consideration of the point in this appeal compels the conclusion that defendant's contention is not justified.

At the outset, it may be stated there is a conflict in the cases as to whether a railroad company is under a duty to maintain a lookout at private crossings. (74 C. J. S., Railroads, § 738 [c], p. 1383.) However, where a railroad company voluntarily constructs and maintains a crossing and keeps it in repair at a place other than a public street or highway, knowing it will be used and has been used by someone, it in effect gives its consent to, if it does not invite, the use of the crossing and has the duty to operate its trains over such crossing with reasonable regard to the safety of those who might be rightfully using it. The railroad is not warranted in treating the users of the crossing as trespassers and must maintain such a lookout as is requisite with the exercise of due care. (*Johnston v. Delano*, 175 Iowa 498, 506, 154 N. W. 1013; 74 C. J. S. Railroads, § 738 [d], pp. 1383, 1384.) See, also, *Illinois Cent. R. Co. v. Lee*, 212 F. 2d 496, 498; *Alabama Great So. R. Co. v. Martin*, 205 Miss. 851, 863, 39 So. 2d 501; *Lamontagne v. Railway*, 97 N. H. 6, 8, 79 A. 2d 835; *Ives v. New York, N. H. & H. R. Co.*, 138 Conn. 471, 474, 85 A. 2d 902. We are not without authority from our own jurisdiction. In *Railway Co. v. Conlon*, 9 Kan. App. 116, 57 Pac. 1063, the court said:

"We are unable to distinguish, under the facts in this case, as to the duties of both plaintiff and defendant, between a private crossing and an ordinary

highway; at least, the plaintiff was not a trespasser, and the defendant company owed to him some duty, and that duty, as we view it, was to exercise ordinary care to avoid injury to the plaintiff or his property in the lawful and reasonable use of his private way. The company had actual knowledge of the existence of the way, and we must presume that it had knowledge of the use which plaintiff made of it and had made of it during a period of more than twenty years; and, knowing these facts, it was bound to use ordinary diligence, such as a prudent man would exercise under the same circumstances, to avoid any collision with the plaintiff's cattle upon a private way or doing them any injury in the operation of its road. It was the duty of the engineer to be on the lookout for obstructions upon the track, and especially so at this crossing at this particular time of day. It had been the custom of the plaintiff during all the years mentioned to drive his cattle across the track from his pasture to his farm buildings. The evidence is clear and uncontradicted that had the engineer been on the lookout, had he been in the exercise of that care and diligence which the law required of him, he would have discovered the cattle upon the track in time to have avoided injuring them. (Cases cited.)" (l. c. 118, 119.)

In *Morris v. Railway Co.,* 103 Kan. 220, 173 Pac. 346, the court said:

". . . A lookout, of course, must be kept for persons upon public crossings, and likewise for the safety of persons passing on or over certain parts of the track by *license* or *permission*. . . ." (l. c. 224.) (Emphasis supplied.)

The evidence in the instant case shows that the crossing was kept in repair by Union Pacific and that plaintiff had used it for a period of from eight to ten years. The engineer and fireman were well acquainted with the area and had been traveling through it for many years. They were under a duty to maintain a lookout for obstructions upon the track and whether or not they breached that duty was a question for the jury.

Defendant urges the allegations of the amended petition and the facts disclosed by the evidence were insufficient to raise the issue of last clear chance. Assuming, but in no sense deciding, that such was the case, this still would not justify the sustaining of the demurrer or the motion for a directed verdict. They were properly overruled because last clear chance, if properly pleaded and proved, was only one of the grounds upon which plaintiff could have relied for recovery. If the evidence was sufficient to take the case to the jury upon any theory, the demurrer and motion were properly overruled. (*Claggett v. Phillips Petroleum Co.,* 150 Kan. 191, 198, 92 P. 2d 52.) As we have seen, the evidence was sufficient to take the case to the jury on the theory of primary negligence; consequently, the demurrer and motion for a directed verdict were properly overruled.

Defendant's second contention is that the trial court erred in

overruling its motions to set aside answers to special questions 6, 8, 9, 10, 13 (b), (c), (d), (e) and (f) and for judgment on the remaining special findings notwithstanding the general verdict, claiming that they are inconsistent with the general verdict, acquit defendant of negligence, and entitle it to judgment as a matter of law.

In considering this contention we refer to the well-established rule that where the special findings of the jury are susceptible of two interpretations, the court will, if possible, adopt the one which will harmonize the findings with and sustain the general verdict (*Claggett v. Phillips Petroleum Co.*, supra; *Taggart v. Yellow Cab Co. of Wichita*, 156 Kan. 88, 94, 131 P. 2d 924; *Snyder v. City of Concordia*, 182 Kan. 268, 320 P. 2d 820; *Sparks v. Guaranty State Bank*, 182 Kan. 165, 318 P. 2d 1062; *Applegate v. Home Oil Co.*, 182 Kan. 655, 324 P. 2d 203). In the Sparks case it was said:

". . . This court, if possible, will give such a construction to answers to special questions as will bring them into harmony with the general verdict. Also, in considering answers to special questions to the jury, the court will not isolate one answer and place a constrained interpretation thereon, ignoring others, but will consider all of them together. If one interpretation leads to inconsistency and the other to harmony with the general verdict, the latter will be adopted. In order to sustain a motion for judgment on the findings, it is not sufficient that there be some inconsistency among the findings. They must be so contrary to the general verdict as to clearly compel the court to overthrow the verdict and render a contrary judgment as a matter of law. . . ." (l. c. 167, 168.)

Moreover, the special questions are not to be used for the purpose of trapping an unwary jury (*Eldridge v. Kansas City Public Service Co.*, 175 Kan. 879, 882, 267 P. 2d 923).

Other rules requiring application are that ordinarily a general verdict imports a finding in favor of the prevailing party upon all the issues in the case to the extent that the general verdict is not inconsistent with special findings (*Krey v. Schmidt*, 172 Kan. 319, 240 P. 2d 153); also, that for the purpose of obtaining a ruling on a motion for judgment on answers to special questions notwithstanding the general verdict, the motion admits the findings to be true (*Banbery v. Lewis*, 173 Kan. 59, 244 P. 2d 202, and cases cited therein; *Gladney v. Mills*, 177 Kan. 190, 277 P. 2d 631; *Applegate v. Home Oil Co.*, supra).

Defendant contends the answer to question 6 may be set aside and disregarded because it is a mere conclusion, and cites *Krey v. Schmidt*, supra. We do not agree. The question required the

jury to state specifically of what defendant's negligence consisted and its answer was that the engineer was negligent in not seeing the pump in time. The answer was not a conclusion, but a finding of an ultimate fact, based no doubt upon the jury's conclusion that the engineer failed to keep a proper lookout.

Although the answer to question 8 was contrary to the evidence, as we have seen, in the use of the private crossing, plaintiff was under no duty to provide an adequate safety hitch in addition to the drawbar connection. Thus, the question and answer become immaterial.

We do not agree that the jury's answer to questions 9 and 10 are merely conclusions. They are clearly findings of ultimate fact, and as such, may not be disregarded. Defendant cites and relies upon *Ziegelasch v. Durr,* supra, and *Scott v. Bennett,* 181 Kan. 410, 312 P. 2d 224, but they are not in point. Those cases hold that general answers to questions, general in nature and calling for conclusions, if contradicted by special or detailed findings, cannot prevail, but are controlled by and must yield to detailed findings of ultimate facts. In the instant case there were no special findings which contradict the answers to questions 9 and 10, and the evidence upon which they were based was disputed, rather than undisputed as in *Ziegelasch v. Durr,* supra.

Defendant strenuously urges that the answer to question 5 acquits it of negligence. It contends the answer to this question should be construed that the engineer *should have realized* the pump could not be removed when the train was 1445 feet away and that the collision would have occurred anyway since the answer to question 3 was that it required 1970 feet to stop the train going at a speed of 60-65 miles per hour. We do not agree. We think question 5 in fact submits two questions: The first is, when did the engineer *realize* the pump could not be removed; and second is, when *should he have realized* that fact, under the circumstances. There is a difference between the two. In compliance with the duty of this court to give such a construction to answers to special questions as will bring them in harmony with the general verdict, and in view of the answer to question 6 that the defendant's negligence consisted of not seeing the pump in time, we think the jury's finding of 1445 feet must be interpreted to mean the distance the train was from the crossing when the engineer *realized* the pump could not be moved, leaving unanswered the second question, when *should*

*he have realized* that fact. As thus construed, the answer to question 5 is not inconsistent with the general verdict which imparts a finding that the engineer should have realized the pump could not be moved when he was at least 1970 feet from the crossing.

All of the findings of the jury with respect to the contentions heretofore discussed, except finding 8, are supported by substantial evidence and are not in conflict with the general verdict so as to compel this court to overthrow it and render a contrary judgment as a matter of law.

With respect to damage to plaintiff's crops, the defendant maintains it was error to refuse to set aside the answers to 13 (b), (c), (d), (e) and (f); in refusing to conform the verdict to special finding 13 (a), and in overruling its objection to the admission of evidence relating to the value of the crops because: (1) such loss or damage was too remote and speculative to be a proper element of damage, and (2) under the law plaintiff was required to mitigate any such damage, and this he failed to do.

Assuming, *arguendo,* that such damage was not too remote and speculative to be¡ a proper element of damage, we turn to a consideration of the question whether plaintiff was required by law to mitigate the damage he suffered and whether under the circumstances he could have done so. If plaintiff was required by law to mitigate the damage and he failed to do so, then the motion to conform the verdict to special finding 13 (a) should have been sustained.

The defendant pleaded that plaintiff failed to take appropriate measures readily available to him as were reasonable and proper under the circumstances to prevent or mitigate any damage which he may have suffered, and that by the exercise of reasonable care and diligence he could and should have prevented and avoided the damage to the crops.

It is a general rule of law that one who is injured by the wrongful or negligent acts of another is bound to exercise reasonable care and diligence under the circumstances to avoid loss or to minimize the resulting damages and to the extent that his damages are the result of the failure to exercise such care and diligence, he cannot recover (*Atkinson v. Kirkpatrick,* 90 Kan. 515, 135 Pac. 579; *Wholesale Grocery Co. v. Kansas City, et al.,* 115 Kan. 589, 595, 224 Pac. 47; *Griffin v. Oklahoma Natural Gas Corp.,* 132 Kan. 843, 849, 297 Pac. 662; *Fritz v. Western Light and Power Corp.,* 140 Kan. 250,

36 P. 2d 90; *Foster v. Humburg*, 180 Kan. 64, 68, 299 P. 2d 46; *Anderson v. Rexroad*, 180 Kan. 505, 513, 306 P. 2d 137; 15 Am. Jur., Damages, § 27, p. 420). Thus, plaintiff was under a duty to exercise reasonable care and diligence under the circumstances to mitigate the damage to the crops and the undisputed evidence was that he could have obtained another pump by calling certain irrigation equipment dealers on the telephone. Dealers of such equipment testified they had irrigation pumps on hand on July 4, and that they could have been reached or contacted by the plaintiff on that date or on July 5, even though July 4 was Sunday and July 5 was a holiday, and that immediate delivery could have been made. Moreover, the jury by its answer to special question 12 found that the plaintiff could have, by the exercise of reasonable diligence under all the circumstances, rented or purchased a pump with which to irrigate his field and thereby avoid loss of his crops. This he failed to do, and he may not recover for that loss. In *Lawson v. Brokmann*, 116 Kan. 102, 226 Pac. 252, an analogous situation was presented. A hay baler was wrongfully attached and held for a time. The owner asked for profits which he might have earned by its use while it was wrongfully held. The court denied allowance of the claim, and said:

". . . If he (the owner) had contracts or could have procured them, it was within his power and duty to rent or procure a baler for that purpose, or perhaps he might have obtained the return of his own baler by the mere execution of his bond. He was not warranted in sitting idly by in order to enhance his demand for damages by profits he might have earned by the use of the baler. It was his duty to mitigate the damages in any practical and reasonable way that was available to him. . . ." (l. c. 106.)

As here, the plaintiff had it within his power to rent or purchase a pump with which he could irrigate his field and avoid loss of his crops and he was not warranted in sitting idly by in order to enhance his demand for damages by allowing the crops to die from lack of water. Thus, the trial court erred in failing to set aside answers to question 13 (b), (c), (d), (e) and (f) and to sustain defendant's motion to conform the verdict to the special findings by reducing the amount of the verdict to $1600.

Other points have been argued and briefed by the defendant, but in view of the conclusions heretofore announced we think it is unnecessary to discuss and decide them. From what has been said, it follows that the judgment of the trial court insofar as it pertains to the allowance of damage for the loss of crops is re-

versed, and insofar as it allows damage for the destruction of the pump is affirmed.

It is so ordered.

PRICE, J., dissenting in part: I agree with our holding that the allowance of damage for loss of crops should be reversed and set aside, but I disagree with the affirmance of that portion of the judgment allowing damage for destruction of the pump.

We are dealing here with specific findings of a jury on disputed questions of fact and are required to take them at their literal face value.

Answer No. 5 says that the engineer realized, or, in the exercise of due care under the circumstances, should have realized the pump could not be removed from the track when the train was *1445* feet away.

Answer No. 4 says the brakes were applied when the train was *700* feet away.

Answer No. 6 says the negligence of the railroad was the negligence of the engineer in not seeing the pump in time.

I think the only logical construction of these three answers, considered together, is that when *1445* feet away the engineer should have applied the brakes, but he did not do so until after the train had travelled *745* feet—therefore he was negligent.

So far, so good—but that is not all this jury found!

In answer No. 3 it *also* found that with maximum service-application of the brakes it would take *1970* feet to stop the train.

This jury found, therefore, that even if the engineer had applied the brakes at the instant he first realized, or should have realized, the pump could not be removed from the track, the train still could not have been stopped in that distance (*1445* feet) and therefore would have struck the pump anyway.

Under the facts as found, failure to do an act which is physically impossible does not constitute negligence. (*Gibbs v. Mikesell*, 183 Kan. 123, 131, 132, 325 P. 2d 359.) The effect of these special findings is to acquit defendant of negligence, thus entitling it to judgment.